# United States Court of Appeals
## For the First Circuit

No. 14-1278

LISETTE NEERGAARD-COLÓN,

Respondent, Appellant,

v.

PETER MOELLER NEERGAARD,

Petitioner, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella and Selya, Circuit Judges,
and McAuliffe,[*] District Judge.

Phillip Rakhunov, with whom Kevin M. Colmey and Sullivan & Worcester LLP, were on brief for appellant.
Laura E. Gibbs, with whom Kristin S. Doeberl and Ginsburg Leshin Gibbs & Jones, LLP, were on brief for appellee.

May 21, 2014

---

[*]  Of the District of New Hampshire, sitting by designation.

**TORRUELLA, Circuit Judge.** Respondent-Appellant Lisette Neergaard-Colón (the "mother") and Petitioner-Appellee Peter Moeller Neergaard (the "father") have two young daughters, S.S.N. and L.A.N. Although both girls were born in the United States, they lived abroad with their parents for approximately a year and a half after their father's employer temporarily relocated him to Singapore in June 2012. The family's time in Singapore ended in January 2014 when the mother traveled with the children to the United States and refused to return. As a result, the father filed a petition for the return of the children to Singapore pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (the "Hague Convention"), as implemented by the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq.

The mother now appeals from the district court's grant of the father's petition. She claims that the district court erred by determining that the children's place of habitual residence was Singapore without first considering whether the parties intended to retain their habitual residence in the United States while living abroad for a temporary period of fixed duration. We agree, and we therefore remand to the district court for further proceedings.

## I. Background

The mother, a citizen of the United States, was born in Connecticut and moved to Boston in 1990. She began teaching in the

-2-

Boston public schools in 1995. The father, a citizen of Denmark, came to the United States around 1999 to pursue a Ph.D. at Boston University. In 2004, he obtained employment as a software consultant with Ab Initio Software Corporation, a company headquartered in Massachusetts. The father became a permanent resident of the United States and obtained a green card in 2011. The couple married in Massachusetts that same year, and their daughters were born in Massachusetts in February 2011 and February 2012. The children are citizens of both the United States and Denmark.

At some point in late 2011 or early 2012, the father's employer informed him that it wanted to relocate him temporarily to Singapore for a three-year assignment. The father claims that he discussed the assignment with his wife and that they agreed to live in Singapore for at least three years. The mother asserts that she agreed to a stay of no more than three years in Singapore, that the father said it could be as short as two years, and that the couple agreed to reevaluate the situation after a year to consider an early return to the United States.

In June 2012, the family packed up their things and moved to Singapore, where they rented an apartment. At that point, S.S.N. was a little over a year old, while L.A.N. was roughly four months old. The father obtained an employment pass authorizing him to work in Singapore through 2015, and the mother and children each

-3-

received a dependant's pass.  While in Singapore, the father was paid by the Singapore-based entity Ab Initio Software Private Limited.  The mother, who did not obtain an employment pass, was not authorized to work in Singapore.

The family obtained health insurance in Singapore through the father's employer, and the parties opened a bank account there.  They also found pediatricians for their daughters, arranged play dates, and purchased a Singapore Zoo membership.  The older daughter, S.S.N., was enrolled in parent-accompanied "EduPlay" classes, and the parents looked at a few Singapore preschools.

During their time in Singapore, the parents retained ownership of their two properties in Boston, one of which they had purchased just weeks before moving to Singapore.  They rented both properties to tenants on one-year leases.  They kept open their bank accounts and retirement accounts in the United States, as well as their credit cards issued by U.S. banks.  The mother preserved her position with Boston public schools by requesting a three-year extension of her maternity leave, and the father maintained his green-card status.  The family also visited the United States for a span of several weeks for Christmas in 2012 and again during the summer of 2013.

Despite the parents' participation in marital counseling in Singapore, their relationship deteriorated while they were living abroad.  The mother expressed her desire to return to the

United States after a year, but the father disagreed.  In December 2013, after a year and a half of living in Singapore, the family traveled together to Denmark to visit the father's family.  From there, the father flew back to Singapore, while the mother and children traveled to the United States to visit her friends and family for two weeks.  They arrived in the United States on January 4, 2014, but they failed to board their return flight to Singapore on January 20, 2014.  The mother informed the father that she would be staying in the United States with one-year-old L.A.N. and two-year-old S.S.N.[1]

On February 21, 2014, the father petitioned the district court for the return of the children to Singapore pursuant to the Hague Convention.  The district court granted the petition on March 10, 2014, and this timely appeal followed.  On March 18, 2014, this court granted a temporary stay of the district court's order, which remains in effect.

## II. Analysis

We begin our analysis by providing a brief sketch of the relevant provisions of the Hague Convention.  The Hague Convention is a multilateral treaty designed to address "the problem of international child abductions during domestic disputes."  Abbott v. Abbott, 560 U.S. 1, 8 (2010).  It does so by providing for "the

---

[1]  The children both had birthdays in February, so they are now ages two and three.

-5-

prompt return of children wrongfully removed to or retained in any Contracting State."  Id. (internal quotation marks and citation omitted).  Notably, an order of return pursuant to the Hague Convention is not a final determination of custody rights.  It simply ensures that custodial decisions will be made by the courts of the children's country of habitual residence.  Id. at 9.

The term "habitual residence" is not defined by the Hague Convention, but this court -- in keeping with the approach of several of our sister circuits -- "begins with the parents' shared intent or settled purpose regarding their child's residence." Nicolson v. Pappalardo, 605 F.3d 100, 104 (1st Cir. 2010).  While intent is our initial focus, evidence of a child's acclimatization to his or her place of residence may also be relevant.  See Darín v. Olivero-Huffman, 746 F.3d 1, 11-13 (1st Cir. 2014).

In this case, the father has presented a claim of wrongful retention.  Wrongful retention is defined as the retention of a child in breach of another's custody rights "under the law of the State in which the child was habitually resident immediately before the . . . retention."[2]  Hague Convention, art. 3. Critically, the Hague Convention only provides for the return of a

---

[2]  The Hague Convention also requires a showing that "at the time of . . . retention those [custody] rights were actually exercised, either jointly or alone, or would have been so exercised but for the . . . retention." Hague Convention, art. 3. As the parties do not dispute the father's custody rights or exercise thereof, neither of these factors are at issue in this case.

-6-

child retained outside of his or her place of habitual residence. If the state in which a child is retained was also the child's place of habitual residence immediately prior to retention, that retention is not wrongful under the Hague Convention. See Barzilay v. Barzilay, 600 F.3d 912, 917 (8th Cir. 2010). Thus, in order to establish wrongful retention, the father bears the burden of showing by a preponderance of the evidence that Singapore was the children's state of habitual residence immediately prior to their retention in the United States. See Darín, 746 F.3d at 9.

The district court determined that the children's habitual residence immediately prior to their retention in January 2014[3] was Singapore. It thus concluded that the retention of the children in the United States was wrongful, and it ordered that the children be returned to Singapore. The mother contests these findings, arguing that the district court's determination of habitual residence was erroneous. Specifically, she claims that the district court misapplied the legal test for habitual residence by failing to analyze whether the parties ever intended to abandon their habitual residence in the United States, and by placing undue weight on evidence of the children's acclimatization in Singapore.

We review a district court's factual findings for clear error while reviewing its interpretation and application of the Hague Convention de novo. Id. at 8-9. As to a finding of habitual

---

[3] The parties do not dispute the date of retention.

residence, we recently adopted the Seventh Circuit's approach, whereby we defer to the court's findings of intent absent clear error, but we review the ultimate determination of habitual residence -- a mixed question of fact and law -- de novo.  Id. at 9 (quoting Koch v. Koch, 450 F.3d 703, 710 (7th Cir. 2006)).

## A. The parents' shared intent

Particularly when the child in question is very young, our habitual-residence inquiry focuses on the parents' shared intent and settled purpose rather than the child's, as a very young child "lack[s] both the material and psychological means to decide where he or she will reside."  Id. at 11 ("'[T]he intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence.'" (quoting Mozes v. Mozes, 239 F.3d 1067, 1076 (9th Cir. 2001))).  In the event that the parents disagree as to their children's place of habitual residence, we look to the intent of the parents "at the latest time that their intent was shared."  Mota v. Castillo, 692 F.3d 108, 112 (2d Cir. 2012).  This finding of shared intent is critical, as the wishes of one parent alone are not sufficient to change a child's habitual residence.  Darín, 746 F.3d at 11.

Often, a wrongful retention case will require the district court to determine which of two potential habitual residences is in fact the habitual residence of a child who has spent time in two or more countries.  In such a situation, it is

-8-

imperative that the district court distinguish "between the abandonment of a prior habitual residence and the acquisition of a new one." Id. "A person cannot acquire a new habitual residence without forming a settled intention to abandon the one left behind. Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration." Id. (internal quotation marks and citations omitted).

In this case, the district court -- relying upon the parties' affidavits and without the benefit of an evidentiary hearing -- found that, "at a minimum, the parties agreed to move to Singapore for three years, and the three-year period has not yet elapsed." Accordingly, the court concluded that the parties' shared intent was that their children reside in Singapore at the time immediately prior to their retention.

The mother takes issue with this finding, noting that the court seemingly ignored evidence that the family intended to retain habitual residence in the United States. She argues that the court erred when it failed to consider whether the parties intended to abandon their prior habitual residence before concluding that they acquired habitual residence in Singapore during the course of a temporary stay. In short, we agree that the district court's analysis of the children's habitual residence was erroneous.

The district court failed to differentiate between the abandonment of a prior habitual residence and the creation of a new

one as required by Darín.[4]  Instead, it merely found that the parents agreed that the children would be present in a particular place for a particular period of time that had yet to elapse.  If that constituted a sufficient finding of intent to establish habitual residence, any parents consenting to a child spending an academic year abroad or even a summer vacation visiting relatives would risk changing their child's habitual residence.  See Mozes, 239 F.3d at 1074 ("Even the child who goes off to summer camp arguably has a settled purpose to live there continuously for a limited period. . . .  [But] he already has an established residence elsewhere and his absence from it -- even for an entire summer -- is no indication that he means to abandon it." (internal quotation marks and citation omitted)).

Although the issue was squarely before the court, the district court made no factual finding one way or the other as to whether the parents intended to abandon their habitual residence in the United States in favor of Singapore, or whether they intended to retain their habitual residence while simply residing temporarily in Singapore.  As a result, the district court seems to have overlooked an important factor in the habitual-residence analysis.  Cf. Gitter v. Gitter, 396 F.3d 124, 135 (2d Cir. 2005) (finding that parents did not intend to abandon the family's

---

[4]  In fairness to the district judge, she did not have the benefit of our opinion in Darín, which was issued several days after she issued her order in this case.

-10-

habitual residence in favor of Israel where the parents only agreed to move to Israel temporarily for a one-year conditional period); <u>Holder</u> v. <u>Holder</u>, 392 F.3d 1009, 1018-19 (9th Cir. 2004) (holding that the parties lacked shared intent to abandon their habitual residence in the United States where the family moved to Germany for the father's temporary, four-year military assignment).

The father, in an effort to persuade us that the district court's legal analysis was sufficient, reminds us that parents need not intend to stay in a place indefinitely in order to establish habitual residence; in certain circumstances, a settled intention to stay in a place for a limited period may suffice. <u>See</u> <u>Feder</u> v. <u>Evans-Feder</u>, 63 F.3d 217, 223 (3d Cir. 1995). In <u>Feder</u>, the Third Circuit found that where a family moved to Australia, bought a home, obtained jobs, enrolled their son in school, and intended for their child to live in Australia "for at . . . least the foreseeable future," the fact that the mother had reservations about staying indefinitely and ultimately spent only six months in Australia before deciding to leave with her son did not prevent Australia from becoming the child's habitual residence. <u>Id.</u> at 224-25.

The readily distinguishable facts of <u>Feder</u> provide little support for the father's argument. Most critically, here, the parties did not agree to move to Singapore for "the foreseeable future." While there is an ongoing dispute as to the precise

-11-

nature of the parties' shared intent, both parties agree that their time in Singapore was intended to be temporary, corresponding to a three-year job placement.  Additionally, the Feder family put their home in the United States up for sale, but the parents in this case did not, nor did they purchase a home in Singapore.  Unlike Mrs. Feder, the mother here was unable to work while abroad, and unlike Mr. Feder, the father here was on temporary assignment and did not pursue permanent resident status for his family in Singapore. Thus, it is far from clear that the family in this case intended to abandon their habitual residence in the United States and establish a new one in Singapore.

**B. Acclimatization**

Although we have recognized that in certain circumstances, "'a child <u>can</u> lose its habitual attachment to a place even without a parent's consent . . . if the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place,'" <u>Darín</u>, 746 F.3d at 11-12 (alteration in original) (quoting <u>Mozes</u>, 239 F.3d at 1081), we have also cautioned that "[i]n the absence of shared parental intent, the district court should . . . be[] slow to infer an earlier habitual residence has been abandoned," <u>id.</u> at 13 (internal quotation marks and citation omitted).  In the typical case, "[e]vidence of acclimatization is not enough to establish a child's habitual

residence in a new country when contrary parental intent exists."
Id. at 12.

The facts found by the district court in this case do not point so unequivocally towards Singapore being the children's habitual residence that we can conclude the same in the absence of a finding that the parties intended to abandon their habitual residence in the United States. While "a child's life may become so firmly embedded in [a] new country as to make it habitually resident even though there be lingering parental intentions to the contrary," id. at 12 n.14 (internal quotation marks and citation omitted), here, the factual basis of the district court's conclusion was very limited. In sum, the court found that the children spent a substantial amount of time in Singapore and that they had friends, books, and toys there. Although the district court relied on McManus v. McManus, 354 F. Supp. 2d 62 (D. Mass. 2005), to support its acclimatization finding, McManus involved children between the ages of eleven and fourteen who, over the course of two years living abroad, "enrolled in and attended schools, joined organized sports teams, participated in church activities, and engaged in other activities as residents of the country would." Id. at 67 (finding habitual residence in Northern Ireland when parents intended to live there indefinitely and children were acclimatized).

Here, in contrast, the children were ages one and two at the time of retention. These ages are important, because acclimatization is rarely, if ever, a significant factor when children are very young. See Holder, 392 F.3d at 1020-21 (holding that in the case of a ten-month-old child, it is "practically impossible" for a child so young, "who is entirely dependent on its parents, to acclimatize independent of the immediate home environment of the parents"). They did not attend school and did not participate in sports. None of their extended family lived in Singapore, and they took multiple trips -- each several weeks long -- to the United States during the year and a half that they lived in Singapore. On these facts, we cannot conclude that the record points unequivocally to the children's habitual residence being in a particular place. Accordingly, we must remand the case to the district court for a determination of the children's place of habitual residence that considers whether or not the parents intended to abandon their habitual residence in the United States.

### III. Conclusion

The district court's habitual-residence analysis was incomplete. The court erred by failing to determine whether the parties intended to abandon their habitual residence in the United States or whether they intended to retain it while residing abroad temporarily. We therefore vacate the grant of the father's

petition and remand the case for further proceedings consistent with this opinion.

Recognizing that the district court is in the best position to weigh the evidence and to assess the credibility of the parties, we take no position as to whether the parents did or did not intend to abandon their habitual residence in the United States. No costs are awarded.

**VACATED AND REMANDED**.