# United States Court of Appeals
## For the First Circuit

No. 13-2531

FRANCELLY SÁNCHEZ-LONDOÑO,

Petitioner, Appellant,

v.

NELSON GONZÁLEZ,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Torruella and Selya, Circuit Judges,
McAuliffe,* District Judge.

Peter J. Duffy, with whom Barry S. Pollack and Pollack Solomon Duffy LLP, were on brief for appellant.
Stephen J. Cullen, with whom Kelly A. Powers, Miles & Stockbridge P.C., Mary A. Azzarito, and Bruce & Kelley PC, were on brief for appellee.

June 10, 2014

---

* Of the District of New Hampshire, sitting by designation.

**TORRUELLA, Circuit Judge.** Petitioner-Appellant Francelly Sánchez-Londoño (the "mother") appeals from the district court's denial of her petition filed pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (the "Hague Convention"), as implemented by the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq. ("ICARA"). The mother claims that Respondent-Appellee Nelson González (the "father") has wrongfully retained their daughter, E.G., in the United States. She seeks an order requiring the child's return to Colombia, where E.G. lived with her mother for two-and-a-half years. The district court found that no wrongful retention of E.G. occurred under the Hague Convention because the United States was E.G.'s place of habitual residence. After careful consideration, we affirm.

## I. Background

### A. Factual background

The mother is a citizen of Colombia who, in 2004, entered the United States illegally. The father came to the United States from the Dominican Republic and became a naturalized U.S. citizen in April 2000. The two met while working at a home for the elderly in Massachusetts, and they married on December 20, 2005.

In October 2006, the couple's daughter, E.G., was born in Massachusetts. E.G. is a citizen of both the United States and Colombia. After E.G. was born, the family lived together in

-2-

Framingham, Massachusetts, for more than two years, but not without incident. By the second year of their marriage, the parents began having frequent arguments. In addition, the mother was stopped for a traffic violation in 2008, prompting concerns that she would be identified as an illegal immigrant and deported. The couple thus agreed that the mother temporarily would move back to Colombia. From there, they believed she would have a better chance of obtaining legal residency in the United States. The mother also looked forward to reuniting with her older daughter, C.A., from a prior relationship. The parents agreed that the mother would take E.G. back to Colombia with her, and that the mother, E.G., and C.A. would all move to the United States once the mother obtained legal status. The mother and E.G., who was two years old at the time, moved to Colombia on December 7, 2008.

Both parents hoped that the time in Colombia would be brief -- lasting approximately seven to nine months -- and that mother and daughter would be able to return legally to the United States in short order. Those hopes were not realized, however, and what was intended to be a short stay in Colombia turned into a stay of two-and-a-half years. During that time, E.G. lived with her mother and grandmother, and she spent time with relatives, friends, classmates, and members of her church. She spoke Spanish and attended preschool in Colombia. The mother also registered E.G. as

a Colombian citizen so that E.G. would have full rights and would be able to leave Colombia without any problems.

While the mother and E.G. were living in Colombia, the father visited once, for five days, in 2010. He never asked that E.G. be sent to the United States to see him, but he did speak with her several times a day via telephone and computer throughout the time they were apart. The father also worked on petitions seeking permission for the mother and C.A. to enter the United States legally. He filed a petition for the mother in January 2009 and for C.A. in December 2009.

Although C.A.'s petition was granted on December 30, 2010, the mother's petition was denied because she had previously entered the United States illegally and therefore was excluded from reentering for ten years. She applied for a waiver of the exclusion, but on March 24, 2011, her application was denied. The mother appealed the denial of waiver on April 27, 2011.

Meanwhile, time was running short for C.A. to travel to the United States, as her entry visa was set to expire on June 29, 2011. Believing that the father would take good care of both girls and that it would improve her chances of obtaining a waiver if both of her daughters were living in the United States, the mother agreed to let both C.A. and E.G. move to the United States. The father returned to Colombia to pick up the girls, and he flew with

-4-

them back to the United States on May 28, 2011. E.G. was approximately four-and-a-half years old at the time.

Unbeknownst to the mother, however, the father had begun a romantic relationship with another woman, Erin McShane ("McShane"), in 2010. Despite this relationship, and notwithstanding the fact that the immigration attorney he consulted provided no timeline for the granting of the mother's petition, the father repeatedly told the mother that he expected her to return to the United States within a matter of months.

When the father and girls arrived in the United States in May 2011, they lived in the father's residence in Framingham, Massachusetts. During the day while the father was at work, the girls video conferenced with their mother and were sometimes cared for by family friends from church. They were also introduced to K.G., the father's seventeen-year-old daughter from a previous marriage, and to McShane, whom they were told they should not mention to their mother. Despite this instruction, by August or September 2011, the mother began to suspect that the father was having an affair. E.G. began attending daycare around this time, and the mother periodically called the daycare to speak with E.G.'s teachers.

In December 2011, the father informed the mother that he would be sending C.A. back to Colombia.[1] The mother demanded that he also return E.G., who was then five years old, but the father refused. The mother's suspicions of an affair were confirmed when she spoke with C.A. upon C.A.'s return to Colombia in February 2012.

According to the mother, the father cut off all communication between her and E.G. from December 2011 until October 2013. He obtained a new phone number in February 2012, filed for divorce on April 4, 2012, and in May of 2012, he moved from Framingham to Quincy, Massachusetts, with E.G. and McShane. The father did not inform the mother of the move or of their new address, thereby interfering with her ability to communicate with her daughter. When E.G. began kindergarten at a school in Quincy in the fall of 2012, the father did not give the school the mother's contact information.

On November 21, 2012, the Middlesex Probate and Family Court granted the father's uncontested petition for divorce, giving him sole legal and physical custody of E.G. The mother asserts that she did not contest the divorce because she had no opportunity

---

[1] According to the father, he sent C.A. back because C.A.'s father, who lived in Spain, was pressuring him to do so. According to the mother, the father sent C.A. back to Colombia only because he found caring for her inconvenient. This dispute is not material to the issues before us, and we need not choose between these conflicting accounts.

-6-

to do so. The father married McShane after the divorce, and on January 2, 2013, the pair wrote an e-mail to the United States Citizenship and Immigration Services ("USCIS") asking that the mother's immigrant visa petition be terminated. The e-mail explained that the parents had divorced and that the father no longer supported the mother's request.[2]

## B. Procedural background

In February 2012, the mother contacted the Colombia Institute of Family Welfare ("ICBF"), Interpol, the Colombian police, her town mayor, and the media in an effort to secure E.G.'s return. On March 7, 2012, she filed a formal statement with ICBF, and on June 27, 2012, she filed an official application under the Hague Convention. She initiated the present action by filing an emergency petition for E.G.'s return in the district court on May 3, 2013. In that petition, the mother alleged that E.G. had been wrongfully retained in the United States by her father since May 2011, when he took E.G. from Colombia to the United States.

On November 18, 2013, after a four-day hearing, the district court denied the mother's petition for E.G.'s return. The court found that the date of E.G.'s retention was December 2011, when the mother demanded E.G.'s return to Colombia and the father refused. The district court also found that immediately prior to

---

[2]   Nevertheless, the mother received a letter from USCIS on January 10, 2013, saying that it would act favorably on her waiver application.

December 2011, the shared intent and settled purpose of both parties was that E.G. live in the United States, as neither parent had intended that E.G. abandon her habitual residence there. While the court found that E.G. had been acclimatized to Colombia by the time that she left in May 2011, it also found that at the time of her retention in December 2011, E.G. was acclimatized to the United States. Thus, the district court concluded that E.G.'s habitual residence was the United States at the time of her retention, and that her retention was not wrongful under the Hague Convention. This timely appeal followed.

## II. <u>Analysis</u>

The crux of the mother's argument on appeal is that the district court erred in determining that E.G.'s place of habitual residence immediately prior to her retention was the United States and not Colombia. Specifically, she contends that the district court gave too little weight to evidence of E.G.'s acclimatization in Colombia and too much weight to evidence that the mother hoped she could one day live with E.G. in the United States.

Our review of the district court's factual findings is deferential, and we will overturn a factual finding only if it "'hit[s] us as more than probably wrong -- it must prompt a strong, unyielding belief, based on the whole of the record, that the judge made a mistake.'" <u>Darín</u> v. <u>Olivero-Huffman</u>, 746 F.3d 1, 8-9 (1st Cir. 2014) (quoting <u>In re O'Donnell</u>, 728 F.3d 41, 45 (1st Cir.

2013)).  The district court's interpretation and application of the Hague Convention, on the other hand, we review de novo.  Id. at 9. As to findings of habitual residence, "we defer to the court's findings of intent absent clear error, but we review the ultimate determination of habitual residence -- a mixed question of fact and law -- de novo."  Neergaard-Colón v. Neergaard, No. 14-1278, 2014 WL 2111307, at *3 (1st Cir. May 21, 2004) (citing Darín, 746 F.3d at 9).

**A. The Hague Convention**

The Hague Convention, as implemented by ICARA, provides for "the prompt return of children wrongfully removed to or retained in any Contracting State."  Hague Convention, art. 1; see also Abbott v. Abbott, 560 U.S. 1, 8 (2010) (discussing the purpose of the Hague Convention).  Article 3 of the Hague Convention explains that the retention of a child is considered wrongful where the retention is "in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the . . . retention" so long as "at the time of . . . retention, those rights were actually exercised . . . or would have been so exercised but for the . . . retention."  Hague Convention, art. 3.  Accordingly, a petitioner seeking to prove wrongful retention under the Hague Convention must establish by a preponderance of the evidence that, at the time immediately prior to the child's retention: (1) the child's

habitual residence was the place to which the child's return is being sought, (2) the petitioner had custody rights over the child, and (3) the petitioner was exercising his or her custody rights. Darín, 746 F.3d at 9.

If a petitioner meets his or her burden of establishing that a child has been wrongfully retained as described in Article 3, and "a period of less than one year has elapsed from the date of the wrongful . . . retention" to the commencement of judicial or administrative proceedings, the court "shall order the return of the child forthwith," Hague Convention, art. 12, unless the respondent can establish that an enumerated exception applies, see id. art. 13.  If more than a year has elapsed, the court must still "order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Id. art. 12.

In this case, the only factor in dispute is the first factor: whether Colombia was E.G.'s habitual residence immediately prior to her retention in the United States in December 2011.[3] This factor is critical, because "[i]f the state in which a child is retained was also the child's place of habitual residence immediately prior to retention, that retention is not wrongful under the Hague Convention." Neergaard-Colón, 2014 WL 2111307, at *3 (citation omitted).  Although the Hague Convention does not define the term "habitual residence," this court has adopted an

_____

[3]  On appeal, the parties do not dispute the date of retention.

-10-

approach that "begins with the parents' shared intent or settled purpose regarding their child's residence." <u>Nicolson</u> v. <u>Pappalardo</u>, 605 F.3d 100, 103-04 (1st Cir. 2010). As a secondary factor, "evidence of a child's acclimatization to his or her place of residence may also be relevant." <u>Neergaard-Colón</u>, 2014 WL 2111307, at *2.

## B. The parents' shared intent or settled purpose

We begin our analysis with the critical issue of shared intent. Because young children like E.G. "lack[] both the material and psychological means to decide where [they] will reside," our inquiry focuses on the shared intent or settled purpose of the parents, who are entitled to determine the child's place of habitual residence. <u>Darín</u>, 746 F.3d at 11. Specifically, we must determine the intent of the parents "at the latest time that their intent was shared," <u>Mota</u> v. <u>Castillo</u>, 692 F.3d 108, 114 (2d Cir. 2012) (internal quotation marks and citation omitted), recognizing that the unilateral "wishes of one parent alone are not sufficient to change a child's habitual residence." <u>Neergaard-Colón</u>, 2014 WL 2111307, at * 3.

Additionally, we must take care to distinguish "between the abandonment of a prior habitual residence and the acquisition of a new one." <u>Id.</u> at *4 (internal quotation marks and citation omitted). "A person cannot acquire a new habitual residence without forming a settled intention to abandon the one left behind.

-11-

Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration." Id. (internal quotation marks and citation omitted).

In this case, the district court noted the parties' disagreement as to the existence of a shared intent or settled purpose regarding E.G.'s habitual residence prior to her retention in December 2011. On the one hand, the mother claimed that it was her intention that E.G. be with her wherever she lived, while on the other, the father asserted that the parties had always intended for E.G. to return to her habitual residence in the United States. After reviewing the parties' contentions and all available evidence, the district court determined that it was the shared intent and settled purpose of the parties that E.G. live in the United States, and that they did not intend to abandon their habitual residence in the United States in favor of Colombia.

The mother takes issue with this finding of shared intent for a number of reasons. She first argues that the district court erred in determining that the parties did not intend to abandon their habitual residence in the United States. While acknowledging that both parents initially intended that E.G.'s stay in Colombia be temporary, the mother points out that the requisite shared intent or settled purpose to abandon habitual residence in the United States need not have existed at the time of departure, "as it could develop during the course of a stay originally intended to

-12-

be temporary." Ruiz v. Tenorio, 392 F.3d 1247, 1252 (11th Cir. 2004) (per curiam).

The mother is certainly correct that the parents need not have intended that E.G. habitually reside in Colombia at the time they departed the United States, but this does her no favors. Even if the mother changed her mind about the nature of E.G.'s time in Colombia at some point while they lived there, "[o]ne parent's wishes are not sufficient, by themselves, to effect a change in a child's habitual residence." Darín, 746 F.3d at 11. Moreover, nothing in the record suggests that the mother ever intended that E.G.'s time in Colombia be anything but temporary prior to the date of the child's retention. Accordingly, the mother's challenge to the district court's finding that "[n]either party evidenced an intent to abandon the United States as E.G.'s residence" falls flat.

The mother next argues that the district court confused her future hope that the family would live together in the United States with a present, shared intention that E.G. live in the United States regardless of whether her mother could follow. She claims that although the district court cited Mota, it erred by failing to appreciate that Mota's analysis of conditional intent applied. We disagree.

In Mota, the Second Circuit held that the district court's finding -- that the mother intended for her daughter to

live in the United States only if the mother were able to join her -- was not clearly erroneous.  692 F.3d at 114-15.  The mother in Mota "testified that she never intended that [her daughter] would live permanently in the United States, and that she had only helped smuggle [her daughter] across the . . . border to allow her father to visit with her for a few hours."  Id. at 115.  Here, however, the mother's testimony was of a different nature entirely. Specifically, the mother testified that she never discussed the possibility of the father moving to Colombia, that both parties agreed in 2011 that E.G. should be in the United States, and that she agreed that the father could raise E.G. in the United States. There is thus ample record support for the district court's factual finding that "[t]here was no condition, agreed or otherwise, that E.G. would return to Colombia if [the mother] could not gain admission into the United States."  Both parties intended for the separation of daughter and mother to end with the mother's return to the United States, not with E.G.'s return to Colombia.

By way of rejoinder, the mother asserts that any intent she may have had that E.G. habitually reside in the United States was undermined by the father's deceit.  She points to both the father's misrepresentation that it would only take three months to obtain legal entry into the United States and to his secret relationship with McShane, arguing that the district court failed to address how such "false pretenses" affected E.G.'s travel to the

-14-

United States. The district court, however, expressly considered and rejected this claim, finding that the father's behavior "does not change the fact that both parties believed E.G. should live in the United States." It further noted that the parents' settled intent was for E.G. to live in the United States even before the father's alleged wrongdoing, and that "the record does not support the conclusion that [the father] so dominated [the mother] through force or coercion that she did not intend E.G. to live in the United States." Cf. In re Ponath, 829 F.Supp. 363, 367-68 (D. Utah 1993) (holding that where the father coerced the mother to stay abroad "by means of verbal, emotional and physical abuse," the mother's intent and settled purpose to remain abroad were undermined).

A careful review of the record reveals that the district court's finding is not clearly erroneous. The mother testified under oath that she would still move to the United States to be with E.G. if allowed entry, and she did not request that the father return E.G. to Colombia until December 2011. By that time, nearly seven months had passed without any change in the mother's immigration status, and roughly four months had passed since she first suspected that her husband was engaged in an extramarital affair. Neither realization prompted her to request E.G.'s return prior to the father's announcement that he was sending back C.A. in December 2011.

-15-

In the absence of clear error, we must defer to a district court's finding of intent, meaning that the "district court's plausible interpretation of the facts cannot be rejected just because the record might sustain a conflicting interpretation." Darín, 746 F.3d at 8 (citing In re O'Donnell, 728 F.3d at 45). Finding no error -- clear or otherwise -- in the district court's reasoning and review of the record, we are compelled to uphold its factual finding that the parties' shared intent was that E.G. habitually reside in the United States.

## C. Acclimatization

In addition to shared parental intent, factors evidencing a child's acclimatization to a given place -- like a change in geography combined with the passage of an appreciable period of time -- may influence our habitual-residence analysis. Typically, "[e]vidence of acclimatization is not enough to establish a child's habitual residence in a new country when contrary parental intent exists." Id. at 12. Nevertheless, it may be possible for a child to obtain a new habitual residence without such shared intent in certain limited circumstances. "'[A] child can lose its habitual attachment to a place even without a parent's consent if the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place.'" Id. at 11-12 (quoting Mozes v. Mozes, 239 F.3d 1067, 1081 (9th Cir. 2001)); id. at 12 n.14 ("[A] child's life may become so firmly embedded in [a]

-16-

new country as to make it habitually resident even though there be lingering parental intentions to the contrary." (internal quotation marks and citation omitted)).

In this case, the district court recognized that after more than two years in Colombia, E.G. had acclimatized to that country by the time she left it in May 2011.  Noting that the date of retention was December 2011, however, the district court concluded that by that time, E.G. was once again acclimatized to the United States.  E.G. had spent time with her father and half-sisters in Massachusetts, she went on trips to the park and to the swimming pool with a family friend from church, and she had been attending daycare in Massachusetts for nearly four months.  Thus, the district court concluded that E.G.'s return to the United States and her acclimatization there, coupled with the parents' shared intent that E.G. live permanently in the United States, established that the United States was E.G.'s habitual residence at the time immediately prior to her retention.

The mother cites these findings as proof of error, arguing that given the evidence of E.G.'s acclimatization, the district court should have found that Colombia became E.G.'s place of habitual residence.  Such a finding was critical, she adds, because "in the absence of settled parental intent, courts should be slow to infer . . . that an earlier habitual residence has been abandoned," Mozes, 239 F.3d at 1079.  Thus, she argues that had the

-17-

district court properly found that Colombia was E.G.'s habitual residence in May 2011, it should have been slow to find that her habitual residence in Colombia had been abandoned in favor of the United States by December 2011.

This argument not only misses the mark, it actually cuts against the mother's position. True, a district court should be "slow to infer" that an earlier habitual residence has been abandoned in favor of a new one, in the absence of shared parental intent. But that is precisely the approach taken by the district court in this case. In the absence of shared parental intent to abandon habitual residence in the United States, the district court was -- quite correctly -- slow to infer that E.G.'s earlier habitual residence in the United States had been abandoned.

In sum, the district court found, and the record supports, that then-five-year-old E.G. had acclimatized to life in the United States by December 2011. This fact, coupled with the finding of shared parental intent that E.G. live permanently in the United States, shows that E.G.'s habitual residence immediately prior to her retention was the United States. Accordingly, E.G.'s retention in her place of habitual residence was not wrongful under the Hague Convention, and the district court properly denied the mother's petition for the return of E.G. to Colombia.[4]

---

[4] Having determined that the United States was E.G.'s habitual residence such that no wrongful retention occurred, we need go no further. See Redmond v. Redmond, 724 F.3d 729, 742 (7th Cir. 2013)

### III. Conclusion

For the foregoing reasons, we hold that the district court did not err in determining that E.G.'s habitual residence was the United States and that no wrongful retention occurred. We therefore affirm the district court's denial of the mother's petition.

To be clear, the denial of the mother's petition in no way alters the preexisting custody rights of the parents. See Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). Rather, the decision of the district court that we today affirm merely ensures that the courts of E.G.'s place of habitual residence will be able to determine the best interests of the child.

**AFFIRMED**.

---

("If a child has not been moved from its habitual residence . . . relief under the Hague Convention must be denied without further inquiry . . . ."). Accordingly, we will not address the mother's argument that because she met her burden of showing wrongful retention, the district court erred by failing to analyze whether the father met his burden of proof as to an affirmative defense that E.G. was well-settled in the United States.