# United States Court of Appeals
## For the First Circuit

No. 15-1126

FEDERICO MENDEZ,

Petitioner, Appellee,

v.

MAYA K. MAY,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter, Associate Justice,[*]
and Stahl, Circuit Judge.

David H. Chen, with whom John A. Sten and McDermott Will & Emery LLP were on brief, for appellant.
Amber R. Cohen, with whom Cohen Cleary, P.C. was on brief, for appellee.

February 13, 2015

---

[*] Hon. David H. Souter, Associate Justice (ret.) of the Supreme Court of the United States, sitting by designation.

**STAHL, Circuit Judge**.     Petitioner-Appellee Federico Mendez filed a petition pursuant to the Hague Convention on the Civil Aspects of Child Abduction ("the Convention"), as implemented by the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq., to return his seven-year-old son C.F.F.M. to Argentina. Petitioner claims that Respondent-Appellant Maya K. May, the child's mother, wrongfully removed the child to the United States in February 2014.     After a three-day bench trial, the district court granted the father's petition and ordered the child's return, reasoning that, inter alia, C.F.F.M.'s habitual residence lay in Argentina because Petitioner never fully agreed to allow C.F.F.M. to move to the United States.     We disagree, and reverse the district court's grant of the petition and order returning the child to Argentina.

## I. Background

Petitioner is a citizen of Argentina who resides in Buenos Aires.  Respondent is a U.S. citizen and permanent resident of Argentina.  The two began dating in 2005 and lived in the U.S. for a brief period of time before settling in Buenos Aires in 2006. Respondent gave birth to their child, C.F.F.M., in Buenos Aires on December 3, 2007.  C.F.F.M. is a citizen of both Argentina and the United States.  He attended school in Buenos Aires from 2010 through the end of the Argentine school year in December 2013.

Though Petitioner and Respondent never married, the

family lived together until 2009, when the couple's romantic relationship deteriorated and Petitioner moved out.[1] That summer, the parties reached a child custody agreement which provided that C.F.F.M. would reside with his mother and granted the father visitation from Thursday evenings until Sunday nights. Per the 2009 agreement, Respondent could travel outside Argentina with C.F.F.M. for fifteen days in the Argentine winter and up to forty-five days during the Argentine summer; the agreement required Petitioner to authorize Respondent's travel with C.F.F.M. in accordance with that plan. Respondent took C.F.F.M. on multiple trips to the United States in accordance with this plan.

The parties experienced difficulties in their parenting relationship after they ceased cohabiting. In 2011, they argued outside Respondent's apartment the day she returned from a forty-five day trip to the United States with C.F.F.M. Although he was not entitled to visitation that day, Petitioner asked to see the child, and Respondent told him it was not a good time. Petitioner forced his way into her apartment and pushed her to the ground in the process. Later that year, the two engaged in a yelling match in C.F.F.M.'s presence during a car ride. Petitioner called Respondent "trash" and locked her out of the car, driving away with the child. After that argument, Respondent denied

---

[1] C.F.F.M. and Petitioner have not resided together since Petitioner moved out of the family residence in 2009.

-3-

Petitioner visitation for four months. Petitioner sought judicial intervention and the Argentine family court restored his visitation rights. Additionally, the parties filed domestic violence complaints against each other. After an investigation, an Argentine board issued a report finding that Respondent was the victim of Petitioner's physical and psychological violence and that C.F.F.M. was a victim insofar as he witnessed the fight in the car.

In December 2012, the parties negotiated and executed a new coparenting agreement. Respondent retained custody and the agreement reduced Petitioner's visitation. The 2012 agreement permitted Respondent to travel abroad with the child for up to forty-five days each year; Petitioner would execute trip-specific authorization each time.

In spring 2013, Respondent began to consider leaving Argentina to find work elsewhere. She discussed her interest in moving with Petitioner, who opposed her leaving Argentina with C.F.F.M. The district court found that Respondent had "raised such an interest" before and that "the parties had various discussions prior to this time about [Respondent] relocating out of the country." The parties were unable to come to an agreement, even after mediation in July 2013.

The next month, Respondent accepted a job offer in Boston with a September 2013 start date. The parties discussed her upcoming move shortly after she accepted the job offer. During an

-4-

August 13, 2013 Skype conversation, Respondent urged Petitioner to pursue work or educational opportunities in Boston. Petitioner expressed openness to potentially moving to Massachusetts along with Respondent and C.F.F.M., but the parties reached no agreement during the conversation.

The two met in person three times in August and September 2013 to discuss potential arrangements if C.F.F.M. were to relocate to the United States. During the third meeting, Petitioner agreed to allow C.F.F.M. to move to Massachusetts with Respondent. Respondent proposed that C.F.F.M. could travel back to Argentina during U.S. school vacations and agreed to increase Petitioner's visitation time in anticipation of the move. The same day, the two relayed these plans to C.F.F.M.

In accordance with their discussions, Respondent left Argentina to begin her job in mid-September 2013. C.F.F.M. remained in Argentina in the care of Respondent's mother, and Petitioner assumed the agreed-upon increased visitation schedule. The parties corresponded by email after her departure to discuss a new coparenting agreement and to set an exact date for C.F.F.M.'s move. Petitioner preferred a January 2014 move so that the child could complete his school year in Argentina; Respondent wanted him to move before the December holidays so that he could spend time with her family before beginning school in Boston. Petitioner objected to the December departure, reasoning that Respondent's

family could see C.F.F.M. any time now that the child was moving to the United States, but confirmed a January 8, 2014 move date.

In their correspondence, Respondent expressed frustration that even though the two had agreed that C.F.F.M. should move to the United States and Respondent had relocated to Boston with that decision in place, Petitioner had yet to draft or sign a new coparenting agreement. After an acrimonious Skype exchange on October 23, 2013, Respondent emailed Petitioner and asserted that she would invoke her forty-five days per year vacation time in order to allow C.F.F.M. to leave for Boston in early December.

After that email, the parties' communication broke down. Petitioner initiated multiple court proceedings, including an emergency petition to obtain temporary custody of C.F.F.M. and criminal complaints against Respondent and her mother. The district court found that Petitioner included numerous unfounded statements about Respondent in these filings, which stated, among other falsehoods, that she had "abandoned" C.F.F.M. and left for the United States "without any notice" to Petitioner. Respondent returned to Argentina in late November and again in late December to attend court proceedings. At a hearing on Petitioner's criminal complaints, a criminal court judge reduced Petitioner's visitation and prohibited him from having overnight visits with C.F.F.M.

Respondent returned to Boston and then came back to Argentina on February 9, 2014. The family court judge held a

hearing the next day to address Petitioner's temporary custody proceeding and Respondent's filing to obtain travel authorization for C.F.F.M. to visit the U.S. for forty-five days, pursuant to the parties' 2012 agreement. The judge ordered the parties to confer and resolve the latter issue; shortly after the hearing, they informed the judge that they were unable to agree on a resolution. On February 14, the judge issued a decision denying Respondent's request for travel authorization, reasoning that the evidence presented to him indicated "an environment of disagreements and hostilities between [the parties]" which would make a trip disfavorable to C.F.F.M.

That same day, Respondent left Argentina with her mother and C.F.F.M. The district court found that Respondent knew of the Argentine family court's order denying her travel authorization before she left Buenos Aires that day. She drove to a border town near Brazil and Paraguay, and on February 15, made three trips into Brazil and Paraguay in search of an airport where C.F.F.M. could travel to the United States without scrutiny of his visa. On February 16, 2014, Respondent and C.F.F.M. flew out of Paraguay to the United States. Respondent did not inform Petitioner that she had left Argentina; he discovered that C.F.F.M. was no longer in the country when the child did not attend his first week of school in March. Petitioner found Respondent's work phone number and repeatedly called her office. She confirmed that C.F.F.M. was in

Boston under her care. Soon after, Respondent obtained an abuse prevention order against Petitioner from the Suffolk County Probate and Family Court.

Petitioner notified the Argentine family court judge that Respondent had left the country and filed a criminal complaint for child abduction with the Argentine police. On April 11, Petitioner filed for Hague Convention remedies with a central authority in Argentina. On July 15, the Argentine family court judge issued an opinion finding that Respondent wrongfully removed C.F.F.M. under the Hague Convention and that C.F.F.M.'s habitual residence at the time of removal was Argentina.

C.F.F.M. and Respondent have lived in Roslindale, Massachusetts since February 2014. C.F.F.M. attends a Boston public school. Respondent presented expert testimony and a report to the district court from a child psychologist who interviewed C.F.F.M.; the psychologist wrote in his report that the child "spoke adamantly and specifically about not wanting to return to Argentina." The expert opined in his report that removal to Argentina would "sever[] . . . the bonded relationships" with Respondent, her fiancé, and her mother and thus "expose him to psychological harm."

Petitioner filed this action in the district court on October 6, 2014. The court heard three days of evidence in December 2014, and issued its order granting the petition and

-8-

ordering the child's return on January 16, 2015.  This expedited appeal followed.

## II. Analysis

### A. The Hague Convention

The Hague Convention on the Civil Aspects of International Child Abduction is a multilateral agreement among approximately ninety countries, including the United States, intended to combat international child abductions during domestic disputes.  Abbott v. Abbott, 560 U.S. 1, 8 (2010).  The Convention seeks to enforce custody rights and "'secure the prompt return of children wrongfully removed to or retained in any Contracting State.'"  Chafin v. Chafin, 133 S. Ct. 1017, 1021 (2013) (quoting Hague Convention, art. 1).  The Convention's underlying principle is that the courts of a child's country of habitual residence should be the entities to make custody determinations in the child's best interest.  E.g., Lozano v. Montoya Alvarez, 134 S. Ct. 1224, 1228–29 (2014);  Mauvais v. Herisse, 772 F.3d 6, 10–11 (1st Cir. 2014).

A petitioner seeking the return of a child under the Convention must establish the child's wrongful removal by a preponderance of the evidence.  22 U.S.C. § 9003(e)(1)(A); Sánchez-Londoño v. Gonzalez, 752 F.3d 533, 539 (1st Cir. 2014).  The petitioner must show that he or she (1) seeks to return the child to the child's country of habitual residence, (2) had custody

rights immediately prior to the child's removal, and (3) was exercising those rights. Hague Convention, art. 3; Sánchez-Londoño, 752 F.3d at 539-40. If these three elements are met, and the petitioner has commenced judicial or administrative proceedings within one year of the date of wrongful removal, the Convention commands that the court reviewing the petition "shall order the return of the child forthwith." Hague Convention, art. 12. The respondent may counter the presumption of return by establishing the application of one or more of the exceptions or defenses to return enumerated in Articles 12, 13, and 20 of the Convention. 22 U.S.C. § 9003(e)(2); Chafin, 133 S. Ct. at 1021. "Notably, an order of return pursuant to the Hague Convention is not a final determination of custody rights. It simply ensures that custodial decisions will be made by the courts of the children's country of habitual residence." Neergard-Colón v. Neergard, 752 F.3d 526, 530 (1st Cir. 2014).

On appeal, Respondent disputes that Petitioner established his custody rights prior to removal or that Argentina was C.F.F.M.'s country of habitual residence. She argues that even if Petitioner established a presumption of removal, he consented to the child's relocation to Massachusetts, satisfying the exception to return described in Article 13(a) of the Convention.

We review the district court's findings of fact for clear error, mindful that any "plausible interpretation of the facts

-10-

cannot be rejected just because the record might sustain a conflicting interpretation." Darin v. Olivero-Huffman, 746 F.3d 1, 8 (1st Cir. 2014). Interpretations of the Convention and the application of the Convention to the facts are afforded de novo review. Yaman v. Yaman, 730 F.3d 1, 10 (1st Cir. 2013).

## B. Habitual Residence

We begin and end with the question of C.F.F.M.'s habitual residence at the time of removal. See Redmond v. Redmond, 724 F.3d 729, 742 (7th Cir. 2013) ("[E]very Hague Convention petition turns on the threshold determination of the child's habitual residence; all other Hague determinations flow from that decision."); Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 271 (3d Cir. 2007) (same).

Removal under the Hague Convention is only appropriate if the child is being retained in a country other than his or her place of habitual residence. Sánchez-Londoño, 752 F.3d at 540. The Convention itself does not define "habitual residence," leaving the interpretation of the term to the judicial and administrative bodies of signatory nations. See Nicolson v. Pappalardo, 605 F.3d 100, 103-04 (1st Cir. 2010); Redmond, 724 F.3d at 742–43; Mozes v. Mozes, 239 F.3d 1067, 1071–72 (9th Cir. 2001). In determining a child's habitual residence, this circuit looks first to the shared intent or settled purpose of the persons entitled to determine the child's permanent home; as a secondary factor, we may consider the

child's acclimatization to his or her current place of residence.[2] Sánchez-Londoño, 752 F.3d at 540, 542. Typically, evidence of acclimatization alone cannot establish a child's habitual residence in the face of shared parental intent to the contrary. Neergard-Colón, 752 F.3d at 532.

The question of habitual residence is a highly fact-specific inquiry that turns on the particular circumstances of each unique case. In discerning the parties' intentions, this court will look "specifically to the last moment of the parents' shared intent." Mauvais, 772 F.3d at 12. Where a child has moved with a parent from one country to another, the record must evidence the parties' latest settled intention for the child to abandon a former place of habitual residence and acquire a new one. Darin, 746 F.3d at 11. In other words, the court "'must determine from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is.'" Id. (citing Mozes, 239 F.3d at 1076). The district court's ultimate determination of habitual residence is a mixed question of law and fact reviewed de novo, with

---

[2] This circuit's framework accords with the approach of the majority of our sister circuits, though other circuits differ in the weight given to the parents' intent versus the child's perspective on his or her settled place of residence. See generally Redmond v. Redmond, 724 F.3d 729, 744-46 (7th Cir. 2013) (citing and describing cases).

subsidiary findings of the parties' intent reviewed for clear error. Neergard-Colón, 752 F.3d at 530.

As the district court found in its opinion, during a meeting at a Buenos Aires restaurant in early September 2013, Petitioner agreed to let C.F.F.M. move to Boston after the close of the child's school year in Argentina. The same day, the parties together told their son that he would move to Massachusetts with Respondent. Nevertheless, the district court found that Petitioner and Respondent "came close to forming . . . a shared intent, [but] did not actually do so."

This finding constitutes clear error. The record is replete with Petitioner's own statements acknowledging and planning for the child's upcoming move, particularly during September and October of 2013, after Respondent moved to Boston and before the parties' relations broke down and Petitioner initiated civil and criminal proceedings against Respondent and her mother. For example, on September 30, 2013, in response to Respondent's request for C.F.F.M. to fly to the United States that December, Petitioner wrote in an email, "I would prefer if you can wait until he moves to you by the end of the year. . . . I really do not see the point of him going there when it would be just two or three weeks before he moves there." On October 10, Petitioner suggested that Respondent meet him and C.F.F.M. in Miami in January 2014 and then take the child back to Boston, since Petitioner and his family had

planned to be in Florida for a family trip that month. After Respondent suggested that Petitioner and C.F.F.M. meet her in New York to celebrate the New Year, Petitioner said he would check with his family but stated, "For now, what is sure is January the 8th." Even during a tense Skype exchange on October 23, 2013, Petitioner expressed his understanding that C.F.F.M. would permanently move to the United States at the turn of the new year. Respondent renewed her request for C.F.F.M. to move before January 8, 2014, alluding to her family's holiday celebration in New York; Petitioner responded that "[C.F.F.M.] will be in the us [sic] in january [sic]" and that Respondent's family "will have plenty of time [to spend with the child] know [sic] that [C.F.F.M.] is going to be in the us [sic] living there." After this Skype exchange, Respondent emailed Petitioner and stated that she would invoke her forty-five day travel authorization in order to take C.F.F.M. with her to Boston on December 4, 2014, triggering the breakdown in the parties' communications.

Even though Petitioner changed his mind and decided that he did not want C.F.F.M. to move to Boston, the record establishes that the last *shared* intent of the parties was for their son to relocate permanently with his mother soon after C.F.F.M. finished the Argentine school year in December 2013. The "unilateral wishes of one parent are not sufficient" to overcome the last settled purpose of the parents. Sánchez-Londoño, 752 F.3d at 540 (internal

-14-

quotation marks omitted). Indeed, in Re Bates, a United Kingdom decision considered a leading case on habitual residence, the parents' intention for the child to live in New York for a set period of time governed even where the parents made the decision while touring the Pacific Northwest, and had borrowed a New York apartment for later that spring only on a temporary basis. Re Bates, No. CA 122/89, High Court of Justice, Family Div. Ct. Royal Courts of Justice, United Kingdom (1989), available at 1989 WL 1683783. The mother brought the child from the West Coast to New York while the father, an Englishman, continued on to Asia. A few days later, the father telephoned his daughter's nanny and told her to take the child to London, where the father owned a house. The mother filed a petition under the Hague Convention in the British courts immediately after she discovered that the child and nanny were gone. The British court found the child habitually resident in New York, reasoning that the "arrangements that had been agreed, however acrimoniously" by the parties "amounted to a purpose with a sufficient degree of continuity to enable it properly to be described as settled," though at the time the parents made the decision the child had only briefly visited New York before. Here, the district court erroneously reasoned that Petitioner never signed a written agreement memorializing the parties' new parenting plan, and refused to issue a travel authorization permitting C.F.F.M. to leave Argentina. But the parties did not make their

-15-

joint decision for C.F.F.M. to move to the United States contingent on signing an official instrument; like in Re Bates, the parties verbally agreed to the plan.  While in some circumstances, written evidence of a parties' agreement may inform a court's decision-making, we reject the idea that such formal documentation is required to establish the settled intention of the parties.

Additionally, the district court misapplied the governing law of this circuit when it held that a change in habitual residence "requires an actual 'change in geography,'" citing a case from the Ninth Circuit.  See Mozes, 239 F.3d at 1078 ("While the decision to alter a child's habitual residence depends on the settled intention of the parents, they cannot accomplish this transformation by wishful thinking alone.  First, it requires an actual 'change in geography.'") (quoting Friedrich v. Friedrich, 983 F.2d 1396, 1402 (6th Cir. 1993)).  This circuit has never added such a requirement in the context of the habitual residence test. To the contrary, we have explicitly described a change in the child's geography as but one "consideration[] for the court" and "one factor in our [habitual residence] analysis," not as a full-fledged prerequisite.  Darin, 746 F.3d at 12–13; see also Mauvais, 772 F.3d at 14 ("'[F]actors evidencing a child's acclimatization to a given place -- like a change in geography combined with the passage of an appreciable period of time -- *may* influence our habitual residence analysis.'") (emphasis added) (quoting

Sánchez-Londoño, 752 F.3d at 542).  To be sure, there may be situations in which an actual change in the child's geography factors heavily in the habitual residence analysis.  Lest there be confusion, a child's presence in a new country of habitual residence is not required to effectuate his parents' settled intention to abandon his old place of residence and acquire a new one.  A contrary requirement would incentivize a feuding parent to move his or her child immediately upon the formation of an agreement even if, as here, it would be better for the child to finish out a school year or wait until the parent has settled the family's living situation before the child joins her.

Finding clear error in the district court's factual findings concerning the parties' intent, and errors of law in the district court's application of the Convention to the facts of this case, we hold that the United States was the child's habitual residence at the time of removal based on his parents' mutual and settled agreement to move him there.[3]  No actual change in the

---

[3] We do not discuss the question of C.F.F.M's acclimatization to the United States, as neither the district court nor the parties addressed the issue.  In any event, acclimatization is "rarely, if ever, a significant factor when children are very young," Neergard-Colón v. Neergard, 752 F.3d 526, 533 (1st Cir. 2014), and courts typically inquire into evidence of acclimatization when the party opposing return avers that the child's life is so firmly embedded in his or her new country that acclimatization should overcome the parties' past shared intent for the child to live elsewhere, Mauvais v. Herisse, 772 F.3d 6, 14 (1st Cir. 2014).  We do note, however, that Respondent submitted a report, dated December 5, 2014, from a child psychologist who had met with and observed C.F.F.M. and had spoken with his caretakers and teacher.

child's geography is required to effectuate that last shared intent, nor must the parties' intent be memorialized in a written document.  Mindful that the question of parents' shared intent "is not a uniformly applicable 'test' for determining habitual residence," we caution that our holding rests of the particular facts of this case.  Cf. Redmond, 724 F.3d at 732, 744, 747 (holding that despite parents' initial agreement to raise their baby in Ireland, the U.S.-born child's habitual residence was Illinois given that respondent had sole custody under Irish law at the time she brought him back to the United States and child's life was "firmly rooted" in Illinois at time of petition; "shared intent has less salience when only one parent has the legal right [to fix the child's place of residence]").

         After review of the record, we conclude that Petitioner did not prove that he seeks to return C.F.F.M. to the child's country of habitual residence, one of the three elements of a prima facie case of wrongful removal.  Because Petitioner did not meet his burden to establish a presumption of wrongful removal, we will not reach other arguments raised by the parties, including the

---

The psychologist opined in his report that C.F.F.M. is "reciprocally bonded" to Respondent, her fiancé, and her mother; that the child's "anxiety and fearfulness in the school setting have largely abated" since his arrival in Boston; and that "there is a grave risk that [the child's] return to Argentina would expose him to psychological harm."

affirmative defense of consent.  Cf. Sánchez-Londoño, 752 F.3d at 543 n.4 (citing Redmond, 724 F.3d at 742).

### III. Conclusion

In reviewing Hague Convention petitions, courts must grapple with difficult factual circumstances in which no outcome may appear ideal.  We emphasize that our decision today is not the final word on the parties' ongoing custody dispute; rather, it puts the onus on the requisite Massachusetts court to resolve future questions of custody and access rights.  Nor should this opinion be taken as an endorsement of Respondent's actions in February 2014. Because the district court erred in its habitual residence analysis, we reverse both the grant of the father's petition and the order of return to Argentina.