# United States Court of Appeals
## For the First Circuit

---

No. 14-1763

MANEL MAUVAIS,

Petitioner, Appellee,

v.

NATHALIE HERISSE,

Respondent, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, <u>U.S. District Judge</u>]

---

Before

Torruella, Dyk,[*] and Kayatta,
<u>Circuit Judges</u>.

---

<u>Allison Flood</u>, with whom <u>James Verner Moore</u> and <u>Harvard Legal Aid Bureau</u>, were on brief for appellant.
<u>Matthew P. Barach</u>, for appellee.

---

November 5, 2014

---

[*] Of the Federal Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** Petitioner-Appellee Manel Mauvais (the "father") filed a petition for the return of his two minor children, M.M. and R.M., to Canada pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (the "Hague Convention" or the "Convention"), as implemented by the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq. ("ICARA"). In September 2013, Respondent-Appellant Nathalie Herisse (the "mother") took the children from Canada, where the parents and children had lived for approximately three-and-a-half years, and relocated them to the United States, where the entire family had never lived together.

After a bench trial and consideration of the parties' submissions, the United States District Court for the District of Massachusetts granted the father's petition, determining that Canada was the children's country of habitual residence and that there was no grave risk that returning the children to Canada would expose them to physical or psychological harm. After careful consideration of the evidence and the parties' arguments, we affirm.

## I.  Background

### A.  Family History

The mother and father are both citizens of Haiti, where they met and began a romantic relationship in 2002. The parties

disagree on whether they were formally married, but the father attests that he obtained a divorce from the mother in Haiti in November 2012 and that he remarried in 2013. Currently, the father lives in Canada and the mother lives in Boston, Massachusetts.

Together, they have two female children: M.M. was born in France in December 2005, and is now nearly nine years old; and R.M. was born in the United States in November 2009, and is approximately five years old. The father also has three other children, including twins -- B.M. (male) and S.M. (female), who are now between nine and ten years old -- from a previous relationship.[1]

During the course of their approximately ten-year relationship, the parties intermittently lived together, principally in Haiti and Canada. They lived separately in Haiti from 2002 to 2005. From some point in 2005 until 2007, the father lived in St. Maarten and the mother lived in France, where she gave birth to their daughter, M.M. After this period abroad, the parties both moved back to Haiti, where they lived together from 2007 until 2009.

In September 2009, the mother moved from Haiti to live with her aunt in Massachusetts, where R.M. was born two months

---

[1] There is evidence that the twins lived with the father, the mother, M.M., and R.M. at various times over the years. The father's third child from a previous relationship is not relevant to this appeal.

later.  Meanwhile, M.M. remained with her father in Haiti.  The mother did not return to live in Haiti.

In January 2010, less than two months after R.M.'s birth, a catastrophic earthquake devastated the parties' community in Haiti.  Following the earthquake, in February 2010, the father and M.M. moved to Québec, Canada, where members of the father's family lived.  The mother testified that she asked the father to bring M.M. to Massachusetts, but he refused and urged her to join him in Canada instead.  She further testified that he threatened to harm or kill M.M. if she refused to join him, so she reluctantly took R.M. and moved to Canada in March 2010.  The father denies the allegations that he threatened any physical harm.

At first, the family lived in Montréal, Québec, with the father's sister and her family.  In July 2010, the parents moved into their own apartment, along with their two daughters and the father's twin children.  In January 2011, the mother moved out, taking M.M. and R.M. with her, and leaving behind the father and his older twins.  At first the mother and her daughters briefly lived with the mother's relatives in the area, before they moved to a separate apartment in Montréal.

Over one year later, in February or March 2012, the father prevailed upon the mother to allow him to rejoin her, and he and his other children moved into her apartment.  The parties lived together for some time thereafter.

During the family's time in Québec, M.M. and R.M. visited regularly with relatives on both sides of the family, attended church and Sunday school, and developed Québécois (French Canadian) accents. M.M. attended a Québec primary school during the 2011-2012 and 2012-2013 school years, and was pre-enrolled in the same school for the 2013-2014 school year. R.M. was enrolled in a full-time day care program from the end of April 2013 until late August 2013.

In the fall of 2012, R.M. began to exhibit health problems, including frequent nosebleeds and weight loss. The mother decided that R.M., as a U.S. citizen, should return to the United States to receive medical care. For that reason, the father and mother agreed that the mother's aunt could bring R.M. to the United States for medical care; the parties' written agreement provided that R.M. would be returned to Canada around September 20, 2013. In the fall of 2013, R.M. was examined and treated for eczema, a tendency to experience nosebleeds, and mild anemia, for which she was prescribed an iron supplement.

R.M. was not returned to Canada as agreed. Instead, on September 13, 2013, the mother left Canada with M.M. and traveled to her aunt's home in Massachusetts, where the mother and the two children remained through oral argument in this case.

## B.  Procedural History

On November, 26, 2013, the father filed a petition in the United States District Court for the District of Massachusetts, seeking a court order for the return of M.M. and R.M. to Canada, pursuant to the Hague Convention and its implementing statute, ICARA.  After a bench trial, the district court concluded that the father's petition should be granted and the children be returned to Canada.

In support of that determination, the district court made several findings of fact and conclusions of law.  Among those facts, the district court found that the parties' actions demonstrated that they "both were content" for the children to live in Canada for at least two years immediately prior to the children's removal to Massachusetts.  The court found that even after the mother stopped living with the father, she chose to remain in Canada in her own household with the children.  During this time, the children led "settled" and "acclimatized" lives in Canada, where they attended school and participated in social activities.  The court thus concluded that Canada was the children's habitual country of residence at the time of their removal, and they were wrongfully removed or retained for purposes of the Hague Convention.

The district court further found that returning the children to Canada would not involve a grave risk of physical or

psychological harm.  The court noted that the mother admitted that the father has never harmed or attempted to harm M.M. or R.M.  It further found it "telling" that even after the mother moved out, she took no steps to prevent the father from having contact with the children.  Therefore, the court granted the father's petition for the return of M.M. and R.M. to Canada.  This appeal followed.

## II.  Discussion

"The Hague Convention is a multilateral treaty designed to address 'the problem of international child abductions during domestic disputes.'"  Neergaard-Colón v. Neergaard, 752 F.3d 526, 529-30 (1st Cir. 2014) (quoting Abbott v. Abbott, 560 U.S. 1, 8 (2010)).  To effect this goal, "[t]he Convention seeks 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'"  Abbott, 560 U.S. at 8 (quoting Hague Convention, art. 1).

The "return remedy" is the "central operating feature" of the Convention, id. at 9, and "lays venue for the ultimate custody determination in the child's country of habitual residence rather than the country to which the child is abducted," Lozano v. Montoya Alvarez, 134 S. Ct. 1224, 1228 (2014); see also Abbott, 560 U.S. at 20 ("The Convention is based on the principle that the best interests of the child are well served when decisions regarding

custody rights are made in the country of habitual residence."). Rather than "alter[ing] the existing allocation of custody rights," the return remedy instead "allow[s] the courts of the home country to decide what is in the child's best interests." Abbott, 560 U.S. at 20. "It is the Convention's premise that courts in contracting states will make this determination in a responsible manner." Id.

However, "[t]he return remedy is not absolute." Lozano, 134 S. Ct. at 1229. Instead, there are several exceptions under which return is excused. See id. at 1229-30. Of these, one narrow exception is found in Article 13(b) of the Convention, which "gives a court discretion to return or decline to return a child who has not become settled if 'there is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.'" Id. at 1238 (Alito, J., concurring) (quoting Hague Convention, art. 13(b)); see also Yaman v. Yaman, 730 F.3d 1, 17 (1st Cir. 2013) (stating that if an Article 13 exception is established, "it is within a court's discretion to refuse to order return" to the country of habitual residence, but that "[a]t no point . . . is a court bound to so refuse"); Whallon v. Lynn, 230 F.3d 450, 459 (1st Cir. 2000) ("The article 13(b) exception is a narrow one.").

Here, the mother raises two issues on appeal, arguing that the district court erred (1) by ruling that Canada was the children's country of habitual residence, and (2) by finding that

-8-

returning the children to Canada would not subject them to a grave risk of physical and psychological harm. We address each claim in turn, reviewing the "district court's factual findings for clear error while reviewing its interpretation and application of the Hague Convention de novo." Neergaard-Colón, 752 F.3d at 530 (citing Darín v. Olivero-Huffman, 746 F.3d 1, 8-9 (1st Cir. 2014)).

## A. Country of Habitual Residence

Under the Convention, a petitioner seeking to prove wrongful removal must show, by a preponderance of the evidence, that immediately prior to the removal: "(1) the child's habitual residence was the place to which the child's return is being sought, (2) the petitioner had custody rights over the child, and (3) the petitioner was exercising his or her custody rights." Sánchez-Londoño v. González, 752 F.3d 533, 540 (1st Cir. 2014) (citing Darín, 746 F.3d at 9). Importantly, pursuant to the Convention, the court-ordered return of wrongfully removed or retained children to their country of habitual residence "is not a final determination of custody rights." Neergaard-Colón, 752 F.3d at 530. Rather, such an order of return "simply ensures that custodial decisions will be made by the courts of the children's country of habitual residence." Id. (citing Abbott, 560 U.S. at 9).

The determination of a child's country of habitual residence is "critical, because '[i]f the state in which a child is

retained was also the child's place of habitual residence immediately prior to retention, that retention is not wrongful under the Hague Convention.'" Sánchez-Londoño, 752 F.3d at 540 (quoting Neergaard-Colón, 752 F.3d at 530).

Although the Convention itself does not define the term "habitual residence," our inquiry into this question "'begins with the parents' shared intent or settled purpose regarding their child's residence.'" Id. (quoting Nicolson v. Pappalardo, 605 F.3d 100, 103-04 (1st Cir. 2010)). "As a secondary factor, 'evidence of a child's acclimatization to his or her place of residence may also be relevant.'" Id. (quoting Neergaard-Colón, 752 F.3d at 530); see also Darín, 746 F.3d at 11-13.

When reviewing a district court's findings as to habitual residence, "we defer to the court's findings of intent absent clear error, but we review the ultimate determination of habitual residence -- a mixed question of fact and law -- de novo." Neergaard-Colón, 752 F.3d at 530.

**1. The Parents' Shared Intent or Settled Purpose**

As is the case here, where the children in question are very young, we focus on the shared intent or settled purpose of the parents, rather than the children, because young children "lack[] both the material and psychological means to decide where [they] will reside." Darín, 746 F.3d at 11; see also Sánchez-Londoño, 752 F.3d at 540 (stating that when children are very young, it is

-10-

generally the parents who "are entitled to determine the child's place of habitual residence"); Neergaard-Colón, 752 F.3d at 531. We look specifically to the latest moment of the parents' shared intent, "as the wishes of one parent alone are not sufficient to change a child's habitual residence." Neergaard-Colón, 752 F.3d at 531 (citing Darín, 746 F.3d at 11).

In the absence of clear error in the district court's subsidiary findings of fact, we defer to its finding of intent: its "plausible interpretation of the facts cannot be rejected just because the record might sustain a conflicting interpretation." Darín, 746 F.3d at 8.

In a situation like this, in which the parties have lived in two or more countries, the district court is required to "distinguish 'between the abandonment of a prior habitual residence and the acquisition of a new one.'" Sánchez-Londoño, 752 F.3d at 540 (quoting Neergaard-Colón, 752 F.3d at 531). "A person cannot acquire a new habitual residence without forming a settled intention to abandon the one left behind. Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration." Darín, 746 F.3d at 11 (internal quotation marks and citations omitted).

Here, although certain members of the family lived in various countries over the years -- including Haiti, St. Maarten, France, Canada, and the United States -- only two countries are

legitimate candidates for consideration as the country of the children's habitual residence pursuant to the parents' latest shared intent or settled purpose prior to removal: Haiti and Canada. Indeed, the mother has not put forth any other alternative country of habitual residence. Rather, the crux of her argument on this issue is that the parents never intended to move permanently from Haiti to Canada.

In support of this position, the mother argues that the father only left Haiti after a catastrophic earthquake forced him to seek refugee status in Canada. She maintains that she was coerced to move to Canada, and that she never applied for asylum or status as a permanent resident there. Specifically, the mother alleges that the father forced her to leave Boston and bring R.M. to join him and M.M. in Canada by means of threats. She alleges that he said that if she did not come to Canada, he would buy rat poison and use it to first kill M.M., and then himself. If true, such allegations certainly would undermine the father's argument that both parents shared an intent for the children to reside in Canada.

However, the father denies the mother's claims, and the district court did not affirmatively credit her allegations. The court found that although the mother only "reluctantly" took R.M. to Canada in March 2010, she then proceeded to live there with the father and his children for approximately ten months. In January

-12-

2011, the mother, R.M., and M.M. moved out, first staying with relatives but then moving to a separate apartment in Montréal. In February or March 2012, the mother agreed to allow the father and his other children to move into her apartment. The court further found that "[i]t is clear that the children lived with their mother in an apartment in Montreal for about two years prior to the events that gave rise to the present petition."

Indeed, the court found relevant the undisputed fact that even after the mother stopped living with the father, "she established her own household with the children in Montreal." Thus, the court found that the mother's actions show that she chose to remain in Canada of her own volition, and the fact that "she subsequently had a change of heart and decided that the children would be better off living elsewhere is of no moment, as any such intent was not a shared one with [the father]." For those reasons, the district court concluded that although the parents originally lacked a shared intent for the children to live in Canada when the mother first arrived in March 2010, the parties later formed such an intent at some point during the intervening three-and-a-half years prior to the children's removal and retention in September 2013. The court found that for at least two years during this period, and possibly longer, both parents were "content" to have the children live in Canada.

-13-

On the record before us, we cannot say that these findings are clearly erroneous. Although the mother offers various reasons for her decisions to travel and stay in Canada, including her uncertain immigration status, she does not dispute that she continued to live in Canada -- at times together with the father, and at times separately -- for three-and-a-half years. She asserts that her "action to remain in Canada cannot be viewed as a choice," arguing that "she remained in Canada due to [the father's] extensive control and coercion in the form of verbal and sexual abuse." However, the mother also admits that she moved out of the father's household and remained in Canada for a period of one year. Although she argues that during this period she "had nowhere to go" and could not return to the United States due to poverty and lack of legal immigration status, she fails to explain how circumstances changed such that she was later able to return to the United States in September 2013 but was unable to do so before that time. On these facts, the district court concluded that the mother's "actions show that even when she was not under [the father's] control or influence, she chose to remain in Canada." We find no clear error in this factual finding.

Nonetheless, the mother maintains that the parties did not intend to abandon Haiti. See Darín, 746 F.3d at 11. We find this argument unconvincing. Nothing in the parents' actions suggests that they intended to return to Haiti. The mother left

Haiti in September 2009, and the father left Haiti in February 2010. The mother has not lived in Haiti for five years, and the father has not lived in Haiti for well over four years.

Moreover, neither child was born in Haiti -- M.M. was born in France, and R.M. was born in the United States. There is no evidence of any attempt or future plan by the parents to return to Haiti to raise the children there. In fact, the mother testified at trial that after giving birth to R.M. in Massachusetts, she wanted the father and M.M. to join her in the United States, but he would not. Thus, the evidence shows no shared intent by the parents to return to Haiti or to raise their children in the United States, leaving Canada as the country in which the parents last had a shared intent for their children to reside. See Neergaard-Colón, 752 F.3d at 531-32. Accordingly, we cannot conclude that the district court clearly erred in determining that the parents shared an intent to abandon Haiti in favor of Canada.

Finding no clear error in the district court's findings of the subsidiary facts, we defer to its finding of intent. See Sánchez-Londoño, 752 F.3d at 542 (citing Darín, 746 F.3d at 8). We thus uphold the district court's factual finding that the parents last shared an intent for their children to habitually reside in Canada. See id. at 540-42.

## 2. Acclimatization

Having upheld the district court's factual finding that the parents intended to abandon Haiti and establish Canada as the children's country of habitual residence, we now consider whether the children were nonetheless acclimatized to a country other than Canada. "[F]actors evidencing a child's acclimatization to a given place -- like a change in geography combined with the passage of an appreciable period of time -- may influence our habitual-residence analysis." Id. at 542. "[I]n certain circumstances, 'a child can lose its habitual attachment to a place even without a parent's consent . . . if the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place . . . .'" Neergaard-Colón, 752 F.3d at 532 (quoting Darín, 746 F.3d at 11-12). However, courts should be "slow to infer" that an established country of habitual residence has been abandoned, when the parents have not demonstrated a shared intent to do so. Id. (quoting Darín, 746 F.3d at 13). Relatedly, evidence of acclimatization is generally insufficient "to establish a child's habitual residence in a new country when contrary parental intent exists." Id. at 12 (quoting Darín, 746 F.3d at 12).

Here, the overwhelming weight of the evidence supports the district court's conclusion that "[f]or approximately two years, the children lived in a settled, 'acclimatized' way in Canada." The court found that M.M. attended a primary school and

R.M. attended a full-time day care program in Canada.  While there, "[b]oth children visited regularly with relatives, apparently on both their mother's and their father's sides."  They regularly attended church and Sunday school, and they developed Québécois accents.

The district court further found that "[i]t is noteworthy [that] [R.M.] has spent almost her entire life, and [M.M.] about half her life, in Canada, and the evidence presented at trial shows that both [R.M.] and [M.M.] have had sufficient time for acclimatization."  The mother has failed to demonstrate that these factual findings are clearly erroneous.  Indeed, the record does not support a conclusion that the children were acclimatized to any country other than Canada.  Having found no clear error on this issue, we uphold the district court's factual determination that M.M. and R.M. were acclimatized to life in Canada.

Given the lack of clear error in the district court's factual findings on the parents' shared intent and on the children's acclimatization, both of these factors support the district court's ultimate determination that Canada was the children's country of habitual residence.  See Sánchez-Londoño, 752 F.3d at 542-43.  Accordingly, having been provided no cause to disturb the district court's findings on this issue, we uphold the court's determination that Canada was M.M. and R.M.'s country of habitual residence.

## B. Grave Risk of Physical or Psychological Harm

The determination of Canada as the children's country of habitual residence does not end our inquiry, however. Even if return would otherwise be proper under the Convention, a court "is not bound to order the return of the child" if the party opposing return establishes that there exists a "grave risk" that return to the country of habitual residence "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b).

This harm "must be a great deal more than minimal" -- "[n]ot any harm will do." Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000). Similarly, the risk of harm must be "grave," and not "low." Id. "Courts are not to engage in a custody determination, so '[i]t is not relevant . . . who is the better parent in the long run, or whether [the absconding parent] had good reason to leave her home . . . and terminate her marriage.'" Id. (quoting Núñez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995)).[2]

---

[2] The parties here have not argued for "undertakings," nor has the district court ordered any such measures. In Walsh, we stated that

> [a] potential grave risk of harm can, at times, be
> mitigated sufficiently by the acceptance of undertakings
> and sufficient guarantees of performance of those
> undertakings. Necessarily, the "grave risk" exception
> considers, inter alia, where and how a child is to be
> returned. The undertakings approach allows courts to
> conduct an evaluation of the placement options and legal
> safeguards in the country of habitual residence to
> preserve the child's safety while the courts of that
> country have the opportunity to determine custody of the

Here, the mother seeks to avail herself of this narrow, discretionary exception to the return remedy,[3] arguing that returning M.M. and R.M. to Canada will expose them to a grave risk of physical or psychological harm.  We find no clear error in the district court's determination on this issue.

### 1.  The Mother's Allegations

In her submissions, testimony, and argument, the mother levies a number of serious allegations against the father.  Among other things, she alleges that the father repeatedly raped her, including in the presence of the couple's children.  According to the mother, this sexual abuse began while the parties lived together in Haiti in 2007 and continued through 2009, even after she was pregnant.  She alleges that the sexual abuse and rapes resumed when they lived together in Canada, beginning in July 2010 and continuing through her most recent rape on September 9, 2013.

---

children within the physical boundaries of their jurisdiction.  Given the strong presumption that a child should be returned, many courts, both here and in other countries, have determined that the reception of undertakings best allows for the achievement of the goals set out in the Convention while, at the same time, protecting children from exposure to grave risk of harm.

Id. at 219.

[3]  See Yaman, 730 F.3d at 17 (explaining that the Article 13 exceptions are discretionary and do not require a court to refuse the return remedy if such an exception is shown); Whallon, 230 F.3d at 459 (describing the Article 13(b) exception for "grave risk" as a "narrow" exception).

It was after this alleged rape that she fled to Boston on September 13, 2013.

The mother also alleges that one of the father's twin children, B.M., exhibited sexually aggressive behavior toward his half-sister, M.M. The mother states that this behavior began while the family was living in Haiti and continued when the family was reunited in Canada. She states that both the twins teased and bullied M.M. and R.M., including by biting and scratching M.M. in Haiti. While the family lived in Haiti, the mother alleges, she found B.M. rubbing his penis against M.M.'s genitals. In response, the father whipped B.M. with a belt. Shortly thereafter, after another incident of sexually inappropriate behavior by B.M. toward M.M., the father allegedly told the mother that the behavior was not serious. The mother also alleges that, while the family was living together in Canada in May 2010, she found B.M. and M.M. in the living room with their pants and underwear around their ankles. Once again, the father whipped B.M. with a belt as punishment.

The mother argues that in addition to potential physical and sexual harm, M.M. and R.M. would be subjected to corresponding psychological harm if returned to Canada. At trial, the mother offered her own testimony as well as that of her aunt. She also offered the expert testimony of Dr. Eli Newberger, a Massachusetts pediatrician. Dr. Newberger offered his professional opinion that the children would be subject to a grave risk of physical or

-20-

psychological harm if returned to Canada, on the basis of the mother's assertions of past abuse. The "nature and scope" of Dr. Newberger's work regarding the case involved (1) reviewing the children's medical records at Boston Medical Center, and (2) a visit to his home office, where he interviewed the mother, her aunt, and both children.

Additionally, the mother argues that R.M.'s medical condition cannot be treated adequately in Canada because R.M. is not a Canadian citizen and lacks health insurance in Canada.

## 2. The Father's Position

The father denies the mother's allegations regarding any sexual assault or rape of her, stating that he never abused her sexually and denying that the parties ever had sexual relations in front of the children. He further denies the allegations of sexual abuse of M.M. by his twins.[4] He notes that the mother alleges that his improper discipline was directed only toward B.M. and not against M.M. or R.M.; relatedly, he emphasizes that the mother admits that he never physically harmed M.M. or R.M. The father maintains that, during the parties' separation in Canada, he continued to visit with the children regularly -- generally every

---

[4] In his deposition, however, the father did admit that he had to discipline the twins for inappropriate sexual behavior. He asserts, however, that he "would discipline the children using appropriate methods such as taking away something that they like and sending them to bed early."

weekend (from Friday after school until Sunday night), but also occasionally during the school week.

He notes that the mother never contacted the police regarding her claims of sexual abuse, nor did she ever seek protection or a restraining order from the Canadian courts against him. He asserts that she only filed for a restraining order in the United States on September 17, 2013, after she had relocated to Massachusetts with the children.

The father maintains that his sister and her family have a close relationship with M.M. and R.M., and that his niece would regularly babysit for the children. He asserts that the children were acclimated to life in Canada, have French Canadian accents, have friends in Canada, and that M.M. participated in extracurricular activities such as basketball and ice skating. He further states that medical records indicate that R.M.'s medical condition is mild anemia, which can be treated adequately in Canada with medication and other follow-up treatment.

### 3. Analysis

As "a party opposing return based on Article 13's 'grave risk' exception," the mother here "bears the burden of establishing that exception by clear and convincing evidence"; she must prove subsidiary facts by a preponderance of the evidence. Yaman, 730 F.3d at 11; see also 22 U.S.C. § 9003(e)(2). On appeal, we review the district court's findings of fact with deference, overturning

a factual finding for clear error "only if it 'hit[s] us as more than probably wrong -- it must prompt a strong, unyielding belief, based on the whole of the record, that the judge made a mistake.'" Sánchez-Londoño, 752 F.3d at 539 (quoting Darín, 746 F.3d at 8–9).

Here, the district court noted the mother's testimony that the father "frequently acted toward her in a sexually abusive manner," and that "he insisted on sexual activity at times and under circumstances when the children were or could have been exposed to it."  However, the district court found that this "testimony was general and vague," and that it was "difficult to draw any reliable conclusions about how frequently such conduct occurred or how significant any impact on the children might have been."  The court observed that the mother "admits that [the father] has never harmed or attempted to harm [M.M.] or [R.M.]." Furthermore, the court found it "telling" that "even after moving out in January 2011, [the mother] took no steps to prevent [the father] from having contact with their children."

The court also referred to the mother's testimony that the father's son, B.M., was sexually aggressive toward his half-sister, M.M.  One of these alleged incidents occurred in Haiti, and according to the mother's testimony, the father disciplined B.M. by beating him with a belt.  The mother's aunt testified about a similar incident years later in Canada, but the district court found no evidence as to how B.M. was disciplined for that incident.

Meanwhile, the father's niece testified that all the children, including the older twins, played well together and enjoyed each other's company.

Additionally, the district court reviewed the evidence concerning R.M.'s medical condition. In the fall of 2012, R.M. began experiencing frequent nosebleeds and weight loss. The parents agreed that R.M., as a U.S. citizen, could return to the United States for medical care in late August 2013. The court found that the medical records from the Boston Medical Center showed no major health issues. In the fall of 2013, R.M. was examined and treated for eczema, frequent nosebleeds, and mild anemia, for which she was prescribed an iron supplement.

As to Dr. Newberger's expert testimony that R.M. or M.M. would suffer psychological harm if returned to Canada, the district court found such evidence "unconvincing," because it was not "based on an in-depth investigation, but rather on some office interviews and a review of hospital records that themselves did not disclose any grave medical or emotional issue." Accordingly, the court found that "[t]he evidence fell well short of supporting a finding of a grave risk of psychological harm."

Having reviewed the record evidence and the parties' arguments on appeal, we find no clear error among the foregoing findings of fact. First, we do not find any merit to the mother's argument that the district court improperly discounted

Dr. Newberger's testimony. Dr. Newberger was called as an expert witness, not as a fact witness. The mother's counsel submitted to the district court that "no part of Dr. Newberger's opinion is based upon communication with the children." Dr. Newberger testified that his first involvement in this case began with a conversation with the mother's counsel. He only met with the mother and the children once, he did not review their Canadian medical records, and he never interviewed the father. He testified that "with regard to the interviews of the children, there was nothing of probative importance." Dr. Newberger's expert testimony does not and cannot serve as factual testimony bolstering the mother's narrative regarding alleged past abuse in the household, as he had no independent knowledge of what transpired in the household. Accordingly, we find no clear error in the district court's evaluation of Dr. Newberger's testimony.

Second, we find no clear error in the district court's determination that R.M.'s medical records show "no major health issues," or in its determination that her treated conditions include nothing more than "eczema, frequent nosebleeds, and mild anemia." The mother has not demonstrated that these conditions cannot be adequately treated by health care providers in Canada, such that returning R.M. to Canada would subject her to a "grave risk" of physical harm.

Turning to her other arguments, the mother's allegations of abuse are not to be taken lightly. She has described incidents of brutality that, if true, paint a disturbing portrait of a physically, sexually, and emotionally abusive and controlling husband. We do not doubt that there can be significant, lasting psychological trauma inflicted on children who witness such abuse between their parents. See, e.g., Lynn Hecht Schafran, Domestic Violence, Developing Brains, and the Lifespan: New Knowledge from Neuroscience, 53 Judges' J., no. 3, Summer 2014, at 32, 35 ("The toxic stress that harms developing brains comes from living in a chronic state of tension and fear.").

However, the district court did not fully credit the mother's testimony, which it found to be "general and vague." The father denies the mother's allegations, and the mother has offered scant evidence to corroborate her testimony. There is no indication in the record that the mother previously sought legal protection in either Haiti or Canada against the father, no indication that she sought sole custody previously, and no indication that she made any such allegations prior to her removing the children from Canada and taking them to Boston. To the contrary, prior to removal, the mother had consistently allowed the father to play an active role in the children's lives. The mother admits that the father has never harmed or attempted to harm M.M. or R.M. As previously described, the district court also found it

"difficult to draw any reliable conclusions" about the frequency of the conduct alleged by the mother and how significant its impact was on the children.

Moreover, the mother does not dispute that the father has since remarried. Although she asserts that the father is a "serial spousal abuser" and that the children would experience psychological trauma if returned to Canada -- "a place they associate with their [f]ather's abuse of [their] [m]other" -- there is no evidence or allegation in the record that the father has ever committed abuse of any sort against his current wife. Thus, there is no indication of a "grave risk" that upon their return to Canada the children will be exposed to the type of domestic abuse alleged by the mother.

As to potential sexual abuse of M.M. or R.M. by their half-brother, B.M., who is himself still a young child, there is testimony describing isolated instances of sexually aggressive or inappropriate behavior by B.M. toward M.M. In her requests for findings of fact before the district court, the mother alleged three such instances. However, several years have passed since the last alleged instance of sexually inappropriate behavior by B.M. toward M.M., and both the mother and the father agree that B.M. was disciplined in some way for the prior incident. The father's niece further testified that all the children get along well together. The record does not establish that B.M. continues to exhibit

-27-

sexually aggressive or inappropriate behavior, or that the father and his new wife are unwilling or unable to prevent any such incidents in the future. Thus, on the supported factual findings made by the district court, we cannot say that there is a "grave risk" that B.M. will behave in sexually aggressive or inappropriate ways toward either M.M. or R.M. if they are returned to Canada.

In her submissions, the mother relies heavily on Walsh, 221 F.3d at 204, asserting that the district court, like the district court in Walsh, erred by failing to give proper weight to: the mother's allegations; the connection between exposure to spousal abuse and physical and psychological harm; the danger of the sexualized environment in the home; and the degree of the father's propensity for violence. However, the district court here explicitly considered our decision in Walsh and applied it to the instant case, finding that "[t]he facts of this case are neither as dire nor as clear." Reiterating her most serious allegations of abuse, the mother focuses on attacking the former determination (whether these facts are as "dire"), but, critically, fails to establish that the district court erred in finding that the instant facts are not as "clear" as those in Walsh.

Indeed, the mother's argument regarding Walsh hinges on accepting all of her allegations as true. The district court did no such thing. Rather, the district court merely recited aspects of her testimony.

Nothing in the district court's opinion suggests that it accepted the mother's testimony wholesale or resolved all credibility determinations in her favor. To the contrary, the district court found the mother's testimony to be "general" and "vague," and found that it could not "draw any reliable conclusions" about the frequency of the alleged conduct or its effect on the children. Furthermore, the district court expressed skepticism regarding the degree to which the mother feared for her children's safety, stating that it was "telling" that she "took no steps to prevent [the father] from having contact with their children, unlike the respondent in Walsh, who had sought numerous protective orders out of fear of harm to her or her children." We find no clear error in these determinations, which do not leave us with the "'strong, unyielding belief . . . that the judge made a mistake.'" Sánchez-Londoño, 752 F.3d at 539 (quoting Darín, 746 F.3d at 8-9).

The instant case thus involves competing "he said, she said" testimony from both parties, with little independent evidence corroborating the mother's testimony, and no clear acceptance by the district court of the mother's narrative over the father's. The district court thus effectively found that the mother did not bear her burden of proof in establishing that returning the children to Canada would subject them to a "grave risk" of "physical or psychological harm." We see no error in that

determination.   By contrast, the <u>Walsh</u> case involved "ample evidence" that the father in that case, John Walsh, "has been and can be extremely violent and that he cannot control his temper." <u>Walsh</u>, 221 F.3d at 219.   In <u>Walsh</u>, there was "a clear and long history of spousal abuse, and of fights with and threats against persons other than his wife. These include John's threat to kill his neighbor in Malden, for which he was criminally charged, and his fight with his son Michael."   <u>Id.</u> at 220.[5]

Moreover, John Walsh had severely beaten his wife, Jacqueline Walsh, multiple times over the years, including when she was seven months pregnant.   <u>Id.</u> at 209-12.[6]   Many of these beatings, as well as a beating of John's older son by another marriage, took place in front of Jacqueline's two small children. <u>Id.</u>   John fled the United States for Ireland as a fugitive after

---

[5]   The district court in <u>Walsh</u> explicitly found that the mother in that case was the "victim of random beatings" -- beatings which were known to, among others, the following persons:   three of John's older children from previous relationships; the mother's physician in Ireland, who advised her to seek legal protection and a court order, and to get photographs taken to document the abuse; and a licensed social worker who worked with her case. <u>Id.</u> at 209-12.

[6]   Jacqueline described many instances of attacks by John, including kicks and punches on specific dates that resulted in the following injuries:   a broken tooth; repeated bruises (including on her face, chest, and knees); scratch marks; and an injured coccyx bone (or "tailbone") in her lower spine. <u>Id.</u> at 210.   She sought the Irish equivalent of a temporary restraining order, which John then violated by coming to her home and threatening her again. <u>Id.</u> at 211.   Jacqueline testified at trial, and her allegations were corroborated by additional witnesses, including a social worker and her sister. <u>Id.</u> at 212.

being charged with threatening to kill his neighbor,[7] and he violated court orders in Ireland that he stay away from Jacqueline's home. Id. at 210-11. The district court in Walsh accepted these underlying facts. See id. at 218-22.[8]

On appeal in Walsh, we found that the facts of the case -- "including the father's flight after indictment for threatening to kill another person in a separate case and a documented history of violence and disregard for court orders" -- were "clearly established." Id. at 222. In contrast, the instant case has none of these strong, independent pieces of evidence corroborating the mother's testimony as to the father's alleged abuse. Additionally, the district court here did not fully accept the allegations against the father.

Furthermore, on appeal in Walsh, we placed particular emphasis on John's repeated history of ignoring court orders. See

---

[7] In 1993, in Malden, Massachusetts, after becoming drunk following a wake, John Walsh ran to his next door neighbor's house, "banged on the door, breaking the door's glass, and yelled that he was going to kill the man." Id. at 209. "He did this repeatedly until the police arrived," and he was later charged in a Massachusetts criminal complaint with attempting to break and enter, and threatening to kill another person. Id. He then "absconded to Ireland," id., and he remained a fugitive from justice in the United States at the time of the appeal in Walsh. Id. at 215 ("John is plainly a fugitive.").

[8] See also In re Walsh, 31 F. Supp. 2d 200 (D. Mass. 1998), rev'd, 221 F.3d 204 (1st Cir. 2000); id. at 201 (finding that "John physically abuses Jackie"); id. at 202-04 (making detailed findings of fact that John committed various specific acts of physical abuse against his wife); id. at 208 (concluding that the court had identified "deplorable conditions of domestic abuse" in the case).

id. at 220-21 ("We do not believe th[at] undertakings . . . or even a potential [protective] order, are sufficient to protect the children from the exposure to grave risk in this case. We have no doubt that the Irish courts would issue appropriate protective orders. That is not the issue. The issue is John's history of violating orders issued by any court, Irish or American.").[9] The father here has no such history of violating court orders. Quite simply, this case is not Walsh.

Importantly to our decision here, an order returning the children to Canada is not equivalent to an order mandating that the children live with their father rather than with their mother, another family member, or guardian. Again, an order of return to Canada under the Convention "is not a final determination of custody rights." Neergaard-Colón, 752 F.3d at 530. Instead, implementation of the return remedy here means that the courts of Canada -- the children's country of habitual residence -- will make the appropriate custodial and family law determinations. See id. (citing Abbott, 560 U.S. at 9); see also Charalambous v.

---

[9]  In Walsh, we further explained that:

> John's past acts clearly show that he thinks little of court orders.  He has violated the orders of the courts of Massachusetts, and he has violated the orders of the courts of Ireland. There is every reason to believe that he will violate the undertakings he made to the district court in this case and any [protective] orders from the Irish courts.

Id. at 221.

-32-

Charalambous, 627 F.3d 462, 469-70 (1st Cir. 2010) (per curiam) ("We point out that [the mother] is free, in the courts of [the children's country of habitual residence], to seek custody of the children and such other orders as may become necessary as to the children.").

For all the foregoing reasons, we find no clear error in the district court's underlying findings of fact on the narrow "grave risk" exception.  See Sánchez-Londoño, 752 F.3d at 539; Neergaard-Colón, 752 F.3d at 530.  Nor do we disagree with the district court's conclusion that the mother failed to meet her burden of establishing that exception by clear and convincing evidence.  See Yaman, 730 F.3d at 11; see also 22 U.S.C. § 9003(e)(2) (providing that "a respondent who opposes the return of the child has the burden of establishing . . . by clear and convincing evidence" that the exception set forth in Article 13(b) of the Convention applies).  Therefore, we conclude that the district court did not err in determining that the mother has not shown a "grave risk" that returning the children to Canada would expose them to "physical or psychological harm or otherwise place [them] in an intolerable situation."  See Hague Convention, art. 13(b).

### III.  Conclusion

We find no reversible error in the district court's findings that (1) Canada was the children's country of habitual

-33-

residence, and (2) returning the children to Canada would not subject them to a grave risk of physical or psychological harm. On that basis, we affirm.

**<u>Affirmed</u>.**