# United States Court of Appeals
## For the First Circuit

Nos. 19-2100
     19-2217

NELIO NELSON GOMES DA SILVA,

Petitioner, Appellee,

v.

MARCELENE DE AREDES,

Respondent, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Lipez, Circuit Judges.

Alexandre Edde Diniz de Oliveira, with whom Donna Saadati-Soto, Stephanie E. Goldenhersh, and Harvard Legal Aid Bureau were on brief, for appellant.
Susan E. Stenger, with whom Elizabeth Griffin Crowley, Katie Menard Dalton, and Burns & Levinson LLP were on brief, for appellee.

March 13, 2020

**LYNCH**, **Circuit Judge**.  Marcelene de Aredes "wrongfully removed" her daughter A.C.A. from Brazil, as that term is used in the Hague Convention on the Civil Aspects of International Child Abduction, see T.I.A.S. No. 11,670 (incorporated at 22 U.S.C. § 9001 et seq.), and the child's father petitioned for her return.

De Aredes appeals from a district court order rejecting her defenses to return and ordering the return of A.C.A. to Brazil with A.C.A.'s father, Nelio Nelson Gomes da Silva.  De Aredes argues that the district court erred in finding that two affirmative defenses to return under the Hague Convention did not apply.  She also argues the district court abused its discretion in denying her motion for a new trial.

We affirm the district court's decisions, with this technical caveat:  we direct the district court modify the language of the injunctive decree that directs A.C.A.'s return to Brazil. Modification is necessary to prevent the injunction from being read to have made an inappropriate custody determination.

I.

We briefly address the factual background of A.C.A.'s removal from Brazil and then turn to the procedural history of the case.

A.   Factual Background

De Aredes and da Silva, both Brazilian citizens, met in 1998 and soon after began dating in Muriaé, Brazil.[1]  The two lived together from 2007 to 2016.  They were never married.  In 2010, de Aredes gave birth to A.C.A., who is the natural child of da Silva.  In February 2016, de Aredes and da Silva separated, and da Silva moved out of their home, to a house next door to de Aredes.  M.A. and A.C.A. continued to reside with de Aredes in her home.  The district court found that de Aredes had suffered some degree of abuse by da Silva.  In September 2016, de Aredes took M.A. and A.C.A. to de Aredes's parents' house in Cuparaque, Brazil.  De Aredes, M.A., and A.C.A. stayed in Cuparaque for a few months.  During this time, da Silva did not travel to Cuparaque or visit A.C.A.  In December 2016, and without da Silva's consent or knowledge, de Aredes took the children to the United States.  The Brazilian courts were never asked to determine custody or whether de Aredes had been abused.

De Aredes, M.A., and A.C.A. arrived in the United States on or around December 17, 2016, without a visa or other permission to enter.  De Aredes did not formally apply for asylum at that time.  Immigration authorities released the three on recognizance

_____

[1]   In 2001, de Aredes moved to Boston, Massachusetts, but moved back to Brazil in 2007 to live with da Silva.  Soon after, in November 2007, she gave birth to M.A., who is not the biological child of da Silva.

and ordered de Aredes to attend an immigration hearing in Boston, Massachusetts. The three moved to East Boston immediately afterwards and the two children enrolled in public school.

B.   Procedural History

On November 9, 2018, da Silva filed a Hague Convention petition in the United States District Court for the District of Massachusetts seeking the return of A.C.A. to Brazil. He explained he needed time to engage the proper Brazilian authorities under the Convention and then to obtain United States counsel in order to bring the petition.

De Aredes raised five affirmative defenses to the petition, only two of which are at issue here:  (1) that returning A.C.A. to Brazil would subject A.C.A. to grave risk of physical or psychological harm, see 22 U.S.C. § 9003(e)(2)(A) (implementing article 13b); and (2) that da Silva did not file his petition within twelve months of A.C.A.'s wrongful removal, and A.C.A. was "now settled" in the United States, see id. § 9003(e)(2)(B) (implementing article 12).  On appeal, de Aredes does not challenge the holding that da Silva made a prima facie case of wrongful removal.

After a four-day bench trial in July 2019, the district court concluded that de Aredes had wrongfully removed A.C.A. from Brazil and had not met her burdens of proof on the affirmative defenses.  It forewarned the parties it intended to issue a return

- 4 -

order.  The parties filed a stipulation outlining a plan for da Silva's communication with, and the education of, A.C.A. until her return, as well as the logistics of the return itself.

On October 28, 2019, the district court read its factual findings and legal conclusions into the record, and entered an injunction ordering that A.C.A. be returned to Brazil on January 2, 2020.  The district court's reasoning is described below.  De Aredes appealed the order on October 29, 2019.

On October 30, 2019, de Aredes, M.A., and A.C.A. had an immigration hearing in Boston.  There, de Aredes filed a formal asylum application for herself, A.C.A., and M.A. claiming that da Silva would kill de Aredes and sexually abuse M.A. if they returned to Brazil.

The immigration court later assigned a February 16, 2023 date for the asylum hearing.  On November 6, 2019, de Aredes moved for a new trial, arguing that the formal asylum application and date for a hearing were sufficient to give de Aredes, M.A., and A.C.A. lawful immigration status for the next three years, eliminated their risk of imminent deportation, and so provided new evidence that was material to the analysis of the "now settled" defense.  The district court denied this motion on November 18, 2019.  On November 22, 2019, de Aredes amended her appeal to challenge the denial of her motion for a new trial.

We issued a stay of the removal to give us time to consider the matter and expedited the appeal.

## II.

We address de Aredes's challenges to the district court's rulings on her affirmative defenses and motion for a new trial. We then turn to the language and scope of the injunction.

A.   Standard of Review for Hague Convention Rulings and for Denial of the New Trial Motion

As presented to us, the question of whether the district court erred in concluding de Aredes had not met her burden of proof as to any of her defenses is a mixed question of law and fact. Under the reasoning of the Supreme Court in Monasky v. Taglieri, 140 S. Ct. 719, 730 (2020), we review the question for clear error. "[T]he appropriate standard of appellate review for a mixed question 'depends . . . on whether answering it entails primarily legal or factual work.'" Id. (quoting U.S. Bank N.A. v. Vill. at Lakeridge, LLC, 138 S. Ct. 960, 967 (2018)). Like the "habitual residence" determination at issue in Monasky, the "grave risk" and "now settled" defenses require the court to identify a broad standard and then answer the factual questions of whether return would expose the abducted child to grave risk of harm or whether the abducted child is "now settled."[2]  See, e.g., Yaman v. Yaman,

---

[2]   "[A] long history of appellate practice" can also inform the correct standard of review. Monasky, 140 S. Ct. at 730 (quoting Pierce v. Underwood, 487 U.S. 552, 558 (1988)).  Whether

- 6 -

730 F.3d 1, 9 (1st Cir. 2013) (stating the district court applied a "totality of the circumstances test" to find a child "now settled");[3] Alcala v. Hernandez, 826 F.3d 161, 170-71 (4th Cir. 2016) (holding that the totality of the circumstances test applies to the now settled analysis).

Review for clear error also accords with the goals of the Convention. As Monasky holds, "[t]o avoid delaying the custody proceeding, the Convention instructs contracting states to 'use the most expeditious procedures available' to return the child to her habitual residence." 140 S. Ct. at 724 (quoting Art. 2, T.I.A.S. No. 11,670). Review for clear error "speeds up appeals and thus serves the Convention's premium on expedition." Id. at 730. Under clear error review, any plausible finding as to a witness's credibility "can virtually never be clear error." Díaz-Alarcón v. Flández-Marcel, 944 F.3d 303, 312 (1st Cir. 2019) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 575

_____

the burdens of proof of the grave risk and now settled defenses are met has a "factual foundation" sufficiently "evident" such that, although some Federal Courts of Appeals have explicitly reviewed these mixed questions de novo, see, e.g., Baran v. Beaty, 526 F.3d 1340, 1345 (11th Cir. 2008), as in Monasky, "there is scant cause to default to historical practice." 140 S. Ct. at 730.

[3]    As to the now settled inquiry, Yaman addressed entirely different issues concerning the legal interpretation of the Hague Convention and the district court's equitable discretion. 730 F.3d at 12. It did not address the merits of the now settled analysis, and so does not affect the disposition of this appeal. Id.

(1985)).  The Hague Convention "establishes a strong presumption favoring return of a wrongfully removed child."  Danaipour v. McLarey, 286 F.3d 1, 13 (1st Cir. 2002).  The affirmative defenses to this presumption are construed narrowly.  Id. at 14.  While we review de novo legal issues, which include "the district court's interpretation of the Hague Convention," Yaman 730 F.3d at 10, we see no legal issues here.

As to the denial of the motion for a new trial, our review is for abuse of discretion.  Id.; Cantellops v. Alvaro-Chapel, 234 F.3d 741, 744 (1st Cir. 2000).

B.    The District Court Did Not Err in Finding that Returning A.C.A. to Brazil Would Not Expose Her to a Grave Risk of Harm

The district court rejected de Aredes's claim that returning A.C.A. to Brazil would expose A.C.A. to a grave risk of physical, sexual, and psychological harm.

The district court found that da Silva had "rights of custody over" A.C.A., the removal was wrongful, and da Silva did not sit on his rights.

The court found the relationship between the parents was "tumultuous" and "on occasion [da Silva] engaged in some degree of physical assault or abuse of [de Aredes]."  It found the parental relationship "falls regrettably in the category of dysfunctional relationships that are known generally in all nations."  And it found the evidence of abuse of de Aredes was "not so pervasive" as

- 8 -

to attribute that to da Silva's other interactions with the family. Correctly stating that the grave risk of harm analysis was concerned with harm or potential harm to A.C.A., rather than de Aredes, the district court concluded that de Aredes failed to show by clear and convincing evidence the possible risk of harm to A.C.A.

The grave risk defense requires de Aredes to show, by clear and convincing evidence, "there is a grave risk that . . . return would expose the child to physical or psychological harm." Danaipour, 286 F.3d at 13 (quoting Hague Convention, art. 13, T.I.A.S. No. 11,670, at 8). This standard requires the factfinder to have "an abiding conviction that the truth of its factual contentions are 'highly probable.'" Colorado v. New Mexico, 467 U.S. 310, 316 (1984) (quoting Charles McCormick, Laws of Evidence § 320, at 679 (1954)). De Aredes must prove subsidiary facts by a preponderance of the evidence. Yaman, 730 F.3d at 11.

Further, the "harm must be 'something greater than would normally be expected on taking a child away from one parent and passing [the child] to another.'" Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) (quoting Re A. (a Minor) (Abduction) [1988] 1 F.L.R. 365, 372 (Eng.C.A.)). This defense is not "a vehicle to litigate (or relitigate) the child's best interests." Danaipour, 286 F.3d at 14 (quoting Hague International Child Abduction

Convention:  Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986)).

De Aredes first argues that the finding of "some degree" of abuse of de Aredes requires a finding that A.C.A. would be exposed to grave risk.  Not so.  There is no claim that A.C.A. was ever herself abused.  The claims here are largely that A.C.A. would be at grave risk from seeing the instances of conflict between her parents, or that the conflict between her parents demonstrates that A.C.A. would be at grave risk of da Silva abusing her in the future.  But that degree of conflict does not come close to the witnessed abuse in Walsh v. Walsh.[4]  See 221 F.3d at 219-22.

The district court found that, while da Silva "on occasion . . . engaged in some degree of physical assault or abuse," the abuse was not so severe as in Walsh.  The court found that da Silva never abused A.C.A.  Unlike in Walsh, the "physical

---

[4]    In Walsh, the record showed that John, the petitioner, had an "uncontrollably violent temper" and committed "bloody and severe" assaults on his wife Jacqueline (the abducting parent) and his son from a previous relationship.  221 F.3d at 209, 220-21. The district court found that Jacqueline was the "victim of random beatings," the severity of which medical records confirmed.  Id. at 209.   The abducted children often witnessed these severe assaults, and John forced one of them to see a room and victim bloodied by John's abuse.  Id. at 210.   John also disregarded protective orders and fled the United States after being criminally indicted for threatening to kill his neighbor.  Id. at 215, 220. The court reasoned that this disregard demonstrated that John would violate protective orders in the abducted children's habitual residence.  Id. at 218, 220-21.

- 10 -

assault or abuse" here never resulted in any hospital visits by de Aredes, police complaints, or arrests. And de Aredes's own testimony about the abuse was often conflicting or inconsistent. Further, the details of the abuse alleged were insufficient to support a finding of grave risk as to A.C.A.[5] The district court committed no clear error in concluding that the "showings of physical abuse" were not "so pervasive" as to support a determination of grave risk of harm as to A.C.A.

Nor did the district court err in finding that de Aredes failed to show returning A.C.A. to Brazil would expose A.C.A. to grave risk of sexual harm. That assertion is primarily based on the testimony of M.A.'s therapist, Dana Bonanno, about the alleged sexual abuse of M.A. and de Aredes's characterization of da Silva's testimony as failing to explicitly deny abusing M.A., this being an admission of child abuse.

Bonanno testified that she held therapy sessions with M.A. and, at one session, M.A. stated that "she used to sit on [her] stepfather's lap and move her hips around and that was a way

---

[5] For instance, de Aredes testified the she once brandished a knife in self-defense when she and da Silva were in a fight, and A.C.A. grabbed the knife. De Aredes cited this fight and A.C.A.'s intervention as an example demonstrating that A.C.A. would be exposed to a grave risk of harm if A.C.A. were returned to Brazil. But the district court seemed to credit M.A.'s testimony that it was a butter knife, which, the court noted, "doesn't take on the range of wandering around with a knife all the time."

to massage him."  De Aredes testified that she heard the same story from her aunt.  Bonanno stated that M.A. became withdrawn and avoided eye contact when speaking of da Silva.  Bonanno opined that such behavior was "consistent with childhood sexual abuse." Bonanno also stated later, however, that this behavior could have resulted from M.A.'s recent immigration to the United States. Bonanno also testified that her assumptions regarding M.A.'s behavior, demeanor, and condition were made to advance therapeutic treatment.  They were not conclusions made with a "reasonable degree of medical certainty."  The district court found this distinction important in its conclusions that these assumptions did not carry the weight of "evidentiary inferences."

The district court observed the testimony and demeanor of da Silva by video conference and reasonably found his testimony not to evidence that he had committed sexual abuse of M.A.  See Díaz-Alarcón, 944 F.3d at 312.  The facts of this case are much weaker than in Danaipour v. McClarey.[6]  286 F.3d 1.  In Danaipour, "an expert in the field of child trauma" concluded the younger

---

[6]    In Danaipour, the mother alleged that she witnessed the father inappropriately touching the children, the children exhibited signs of sexual abuse after returning from visits with the father, and one child "complain[ed] of pain in her vaginal area [and] express[ed] general fear of her father."  286 F.3d at 7.  Later, the younger child "made various statements [to her therapist] that could be taken as indicating" her father had sexually abused her.  Id. at 7.  The older child stated to the therapist that the younger sister had also told her of the abuse by the father.  Id. at 7-8.

child suffered from post-traumatic stress disorder.  Id. at 10. "[A]n expert in sexual abuse evaluations . . . testified that, in [the expert's] opinion, to a reasonable degree of medical certainty, the younger [child] had been sexually abused."  Id.  No such facts are present here.  Here, the alleged sexual abuse is not of A.C.A.  De Aredes did not witness any sexual abuse as to A.C.A.'s sister.  The testimony evidence of abuse is far thinner here, and there is no expert testimony as to the certainty of sexual abuse.

C.    The District Court Did Not Clearly Err in Finding that A.C.A. Was Not "Now Settled" in the United States

When the petition for return has been filed one year or more after the wrongful removal, as here, a district court may decline to order return if the child is now settled in the new country.  Hague Convention, art. 12, T.I.A.S. No. 11,670.  Courts also refer to the defense as the "well settled" defense.  E.g., Yaman, 730 F.3d at 22 n.18.  De Aredes must show by a preponderance of the evidence that, as of the petition date, A.C.A. was now settled.[7]  22 U.S.C. § 9003(e)(2)(B).  This defense "protect[s] a child's interest in remaining in a place she is settled."  Yaman, 730 F.3d at 15-16 (citing Lozano v. Alvarez, 697 F.3d 41, 54 (2d

---

[7]    It appears the district court used the date of the petition as the relevant time.  At oral argument, counsel for de Aredes agreed that this date was proper.

Cir. 2012), aff'd sub nom. Lozano v. Montoya Alvarez, 572 U.S. 1 (2014)).

Courts look to the totality of the circumstances in determining whether a child is now settled. See, e.g., Yaman, 730 F.3d at 9; Alcala, 826 F.3d at 170-71. A court may consider any relevant fact, including immigration status. See, e.g., Lozano, 697 F.3d at 56 (stating that an abducted child's immigration status should be only one of many relevant factors in determining whether the child is now settled, and its weight "will necessarily vary"); Alcala, 826 F.3d at 171, 173–74 (similar); Hernandez v. Garcia Pena, 820 F.3d 782, 789 (5th Cir. 2016) (requiring an analysis of the child's immigration status).

The district court considered the relevant facts and found that A.C.A. was not now settled. Although it found that the evidence supported A.C.A.'s having "developed meaningful relationships and lasting emotional bonds with a community in East Boston," the district court found that A.C.A.'s resiliency and ability to form bonds in Brazil would not make her return to Brazil an event that "wrench[ed] [her] out of a well-settled position." In support, the district court properly considered the "unsettled character [of] the immigration status" of de Aredes, A.C.A., and M.A.

De Aredes argues that the district court erred in finding A.C.A. was not now settled and that the district court erroneously

- 14 -

gave dispositive weight to A.C.A.'s immigration status. Both arguments lack merit.

The district court plainly did not give immigration status any such dispositive weight, and so that legal issue is not present in this case. The district court stated that it paid "careful attention . . . to all of the various factors" and, considering A.C.A.'s ties to the community and resiliency, found that she was not now settled. The district court subsequently commented on A.C.A.'s immigration status in support of its finding A.C.A. was not now settled, but nothing in the court's reasoning suggests that A.C.A.'s immigration status controlled the finding.

But the evidence before the district court supported its finding that A.C.A. was not now settled, and that finding was not clearly erroneous. Although A.C.A. was engaged in school, she was repeatedly tardy and absent. During the 2017-2018 school year, A.C.A. was tardy on 40 days and absent 8 days, out of 167 days. In the first half of the 2018-2019 school year, she was tardy 41 out of 113 days. The district court could credit this administrative record as weighing against a finding that A.C.A. was now settled. See Lozano, 697 F.3d at 57 (noting that courts generally should consider as a now settled factor "whether the child attends school or day care consistently" (quoting Duarte v. Bardales, 526 F.3d 563, 576 (9th Cir. 2008) (Bea, J., dissenting)). As of October 26, 2018, just two weeks before the petition date,

de Aredes seemed to struggle "to find a regular and steady employment [yet] at th[at] time however manage[d] to run the household." A.C.A. was diagnosed with "adjustment disorder with depression or anxiety." A.C.A. experienced a documented difficulty adjusting to her move to the United States and the absence of her father, grandparents, and friends in Brazil.

D.   <u>The District Court Did Not Abuse Its Discretion in Denying De Aredes's Motion for a New Trial</u>

The district court denied de Aredes's motion for a new trial. A motion for new trial on the basis of newly discovered evidence requires the movant to show that:

> (1) The evidence has been discovered since the trial; (2) The evidence could not by due diligence have been discovered earlier by the movant; (3) The evidence is not merely cumulative or impeaching; and (4) The evidence is of such nature that it would probably change the result if a new trial is granted.

<u>Duffy</u> v. <u>Clippinger</u>, 857 F.2d 877, 879 (1st Cir. 1988). De Aredes argues that her October 30, 2019 immigration hearing led to such new evidence. She argues that, by setting her asylum hearing date for February 16, 2023, the immigration judge removed de Aredes and A.C.A.'s risk of removal for three years, stabilized their immigration status, and that now made A.C.A. now settled in the United States.

The district court did not abuse its discretion in finding that this showing did not comply with the rule. The evidence was plainly cumulative and not "newly discovered." The

- 16 -

district court was aware of de Aredes's application for political asylum and its possible immigration consequences, and called her October 30, 2019 hearing "neither unforeseen nor unforeseeable." Significantly, the district court found that de Aredes could have filed her application for asylum earlier, but did not.

We affirm the denial of relief from return.

E.   The Injunction Should Be Modified To Be Clear It Did Not
     Determine the Custody of A.C.A

The implementing statute of the Hague Convention expressly forbids a court from determining "the merits of any underlying child custody claims."  22 U.S.C. § 9001(b)(4); see also Yaman, 730 F.3d at 22-23 (stressing that a Hague Convention case did "not involve a determination of custody").  The "return requirement is a 'provisional' remedy that fixes the forum for custody proceedings.  Upon the child's return, the custody adjudication will proceed in that forum." Monasky, 140 S. Ct. at 723 (internal citation omitted) (quoting Linda Silberman, Interpreting the Hague Convention:  In Search of a Global Jurisprudence, 38 U.C.D. L. Rev. 1049, 1054 (2005)).

As the district court explicitly recognized, it is the job of the courts of Brazil, not the district court, to "make the appropriate custodial and family law determinations." Mauvais v. Herisse, 772 F.3d 6, 21 (1st Cir. 2014).  This injunction, as

worded, could be read to violate this rule.  It reads, in the relevant parts:

> On January 2, 2020, A.C.A. shall travel to Brazil <u>to reside in the care and custody of the petitioner Nelio Nelson Gomes da Silva</u>.  Prior to that date, Mr. da Silva will travel to Massachusetts to facilitate A.C.A.'s return to Brazil in his custody . . . .
>     . . . .
> Any <u>further</u> proceedings regarding A.C.A's custodial arrangements shall be conducted by the appropriate Brazilian court under Brazilian law.

Injunctive Decree at 1-2, <u>da Silva</u> v. <u>de Aredes</u>, No. 1:18-cv-12353-DPW (D. Mass. October 28, 2019), ECF No. 102 (emphasis added).  Perhaps the order meant no more than that the parent returning the child to Brazil had the authority to do so.  At oral argument, we were told that de Aredes had not decided whether she would return to Brazil on the removal of A.C.A.  The order that A.C.A. "reside in the care and custody" of da Silva and the reference to "further" custodial proceedings could be read as making a custody determination.  The order should not be read to mean that the proceedings carried out in the district court determined custody.

In consequence, we direct the district court to address and make the needed modifications to the injunction.  At oral argument, counsel for da Silva had no objection to the injunction being made clear that it did not deprive de Aredes of her custody rights as to A.C.A.

III.

The rulings of the district court are <u>affirmed</u> and the district court shall <u>modify</u> the injunction consistent with this opinion.  Any interim conditions imposed by the district court remain in place until A.C.A. is returned to Brazil.